BIGELOW, Respondent, vs. CHICAGO, BURLINGTON & NORTH-
    ERN RAILWAY COMPANY, Appellant.

*September 9 — September 26, 1899.*

*Railroads: Carriers: Ultra vires: Contract for carriage between points
not on line: Consideration: Breach: Measure of damages.*

1. Whether a contract by a railway corporation to transport merchan-
   dise between two points, neither of which is on its own line — over
   which, however, most of the carriage is to be — is *ultra vires,* not
   decided.

2. In an action for the breach of such a contract, brought against the
   railway company by one whom the company, by making the con-
   tract, had induced to buy the merchandise to be transported, the
   company cannot invoke the doctrine of *ultra vires* as a defense.

3. The evidence in this case — showing, among other things, that the
   freight agent of the defendant railway company at a certain city,
   as also his predecessors, had always represented the company in
   its dealings with freighters on the tracks of other roads and also
   with reference to certain establishments outside the city limits,
   and tending to show, by certain correspondence between the gen-
   eral freight agent and the local agent as to the transaction in ques-
   tion, the understanding of both that such dealings were within the
   province and duty of the latter — is *held* to support the conclusion
   of the jury that the local agent had actual authority to contract
   for the carriage of certain freight situated outside the city limits
   and not on defendant's tracks.

4. Where the defendant railway company, in order to induce plaintiff
   to buy certain ice, promised to transport it for him at certain rates
   from the place on another line where it then was, and on the faith
   of such promise he bought the ice, there is a sufficient consideration
   for the contract of carriage.

5. A notification of the plaintiff by the company, in such case, that it
   could not furnish him cars and take the ice from where it was,
   sufficiently shows a breach of the contract, and repeated demands
   by plaintiff were unnecessary.

6. After plaintiff had been so induced to buy the ice, he sold it to one
   who agreed to purchase at an advanced price and pay the freight
   provided the ice could be transported according to defendant's
   promise; and, but for defendant's breach of such promise, plaintiff
   would have received such advanced price. *Held,* that the measure

of damages for such breach of contract was said price, less the expenses of shipping the ice, and less, also, such sum as might have been obtained for it upon sale to other parties, together with interest from the commencement of the action; but it appearing that, though unable to sell to others, plaintiff might, by incurring additional expense — far less than the damage otherwise to result — have availed himself of the sale mentioned, and that he made no effort in that behalf, but allowed the ice to melt, he cannot recover for so much of the loss as he might, by reasonable diligence, have avoided.

APPEAL from a judgment of the circuit court for La Crosse county: O. B. WYMAN, Circuit Judge. *Reversed.*

In the summer of 1896 plaintiff was, and for some years had been, a dealer in ice at La Crosse, with customers to the southward, mainly on the line of the defendant's railroad and connections. Plaintiff claims that about the 1st of August the defendant's station and freight agent at La Crosse came to him, and called his attention to a quantity of ice stored at the abattoir just outside the city limits, which was for sale, and urged him to purchase it. The abattoir was located on a track of the Chicago, Milwaukee & St. Paul Railway Company. Plaintiff responded that he could not use it, as he could not reach his customers over the Chicago, Milwaukee & St. Paul Railway. The agent thereupon assured him that the defendant could and would furnish him cars at the abattoir promptly, take his ice, and ship it to southern points at the regular rates, and especially to Springfield, Illinois, which was a principal shipping point for him, at the rate of $2 per ton, free of the expenses of getting the cars to and from the abattoir, and assured him that the defendant would give him prompt shipments. The plaintiff, relying on these assurances, purchased the ice, amounting to 778 tons, at the price of seventy-five cents per ton. Shortly after, a customer of his from Springfield came to La Crosse, examined the ice, and agreed to buy about 600 tons of it, to be shipped from time to time to him at Springfield, provided

it could be shipped over the defendant's line at a rate of $2 per ton. Thereupon the plaintiff and the proposed customer called on the defendant's agent, who assured them they could depend on the defendant company taking and shipping the ice at the rate mentioned with promptness and in satisfactory cars. Thereupon the Springfield man agreed to purchase the ice delivered on board cars at the abattoir for $2 per ton, provided shipments could be had as promised; he to pay the freight.

Plaintiff shipped one car of the ice to another customer, and one car to the Springfield customer, whereupon the Chicago, Milwaukee & St. Paul Railway refused to switch the defendant's cars to and from the abattoir; claiming it was not within the agreement between railroads for switching charges. The defendant's agent and its general freight agent attempted to negotiate arrangements with the Chicago, Milwaukee & St. Paul Railway, but did not succeed in reaching terms with them, and thereupon failed and neglected to supply plaintiff with cars as requested for the shipment of the ice, and notified them that they were unable to do so. Plaintiff made exertions to sell the ice to other parties unsuccessfully, with the result that it melted in the warehouse and was a total loss. He made no effort to secure transportation from the abattoir to defendant's tracks in La Crosse. He brought suit, and recovered a verdict for $1,101.42 damages for breach of defendant's contract to ship. Defendant's motion to set aside the verdict as against the evidence was denied, and judgment for plaintiff entered.

For the appellant there was a brief by *Losey & Woodward,* and oral argument by *G. M. Woodward.*

For the respondent there was a brief by *Higbee & Bunge,* and oral argument by *E. C. Higbee.*

DODGE, J. 1. The power of the corporation to make the contract in question is strenuously denied. That contract,

in its ultimate analysis, was merely to transport merchandise between two points, neither of which is on its own line,— over which, however, most of the carriage was to be. While such a contract, involving either the delivery over another road beyond its own line, or the bringing of merchandise over another line to its own, has much support from well-considered decisions, we need not here decide it. Whether *ultra vires* or not, the defendant cannot raise that question against the plaintiff here. *John V. Farwell Co. v. Wolf*, 96 Wis. 10; *McElroy v. Minnesota P. H. Co.* 96 Wis. 317.

2. The question of the station agent's authority to make such contract is simplified by the fact, apparent from the record, that both reliance on apparent authority and ratification were eliminated by the court below, and the jury only required to pass on the issue of actual authority, as to which the instructions are not excepted to. We need only inquire, therefore, whether there was any evidence of such actual authority. Danielson was defendant's freight and passenger agent at La Crosse, to solicit and contract for and manage the freight business done by the company at that place. The business establishments of that city extend over a considerable territory, not all within the city limits, and contiguous to different railroad tracks or to none. Any freighting business of this municipal and business settlement would seem from the evidence to fall within the scope of this agency, but defendant offered direct testimony that Danielson's agency did not extend to the abattoir in question, because not on defendant's tracks, and because outside the city limits. The significance of these distinctions is met, however, by evidence, without contradiction, that this agent, as also his predecessors, has always represented the company in its dealings with freighters on the tracks of other roads, and also with reference to certain establishments outside the city limits. In addition, certain corre-

·spondence as to this very transaction, between the agent and the general freight agent of the company, tends strongly ·to evidence the understanding of both that any such dealings which the company might have fell within the province and duty of Danielson. We think there was evidence ·to support the conclusion of the jury that he had actual ·authority in the premises.

3. Was there evidence that a contract, to carry this ice ·was made? We think it plain that none was made between ·defendant and plaintiff at the time of Mr. Baker's visit. 'The evidence tends strongly to show that any promise then made was to Baker, and not to plaintiff; but, even if the ·promise to transport the ice was then made to plaintiff, it ·constituted no contract, for he entered into no reciprocal ·agreement, nor did he change his position to his hurt. There was an entire lack of mutuality. If plaintiff's evidence is believed, however, the earlier transactions were sufficient ·to constitute a contract. The defendant, in order to induce plaintiff to buy the ice, from which it anticipated benefit, ·made the promise to transport from the abattoir to Springfield for $2 per ton; and, on the faith of that promise, ·plaintiff changed his position and bought the ice. Here are ·all the elements of contract: A promise upon a sufficient ·consideration,— whether of benefit to the promisor or of injury to the promisee is immaterial, though both appear to be present. We think there was evidence to go to the jury ·of the making of this contract. There was also evidence of its breach, in that it appeared that Danielson notified plaintiff that defendant could not furnish him cars and take his ice from the abattoir. After definite notification to such effect, no purpose could be served by repeated demands, which both parties knew could not be complied with.

4. On the question of damages, the position taken by the defendant's attorneys was that the price paid by the plaintiff for the ice was the limit of his damages, from which, of

course, must be deducted anything that by reasonable dili-
gence could have been realized for the ice. The court, how-
ever, instructed the jury that as to twenty cars of ice, which
the evidence showed could have been sold to Baker for $2
per ton if the defendant had carried out its contract, the
measure of damages was the loss of this price, less the ex-
pense of loading and any other expense accompanying the
shipping, and less, also, such sum as the plaintiff could have
obtained for the ice upon sale to other parties, together with
interest from the commencement of the suit, and, at the re-
quest of the defendant, instructed them that it was the duty
of the plaintiff to exercise reasonable diligence to dispose of
the ice in some other way after he found it could not be
shipped to Springfield over the defendant's road. We think
the rule of damages laid down by the court was substantially
correct. The action was for breach of contract, not for mis-
representation. It was in evidence that the 600 tons, or
twenty car loads, were absolutely sold for $2 a ton, which
sum would have been received by the plaintiff but for the
defendant's breach of its contract. We see no vice in this
theory. It measured the injury which the plaintiff received
by reason of the defendant's breach, as shown without con-
jecture or uncertainty.

The damages awarded upon the verdict were evidently upon
the theory that 570 tons of ice (being the twenty car loads, less
one car load as to which no breach occurred) were lost to the
plaintiff, and would have yielded him $2 per ton, less about ten
cents per ton for loading. There is evidence to support the
proposition that plaintiff made reasonably diligent efforts to
sell this ice to others, without success, and that he was unable
to satisfy his contract with Baker, or otherwise to dispose of
the ice to customers whom he could reach by shipment over
the Chicago, Milwaukee & St. Paul road, but it is admitted
there was no effort on his part to overcome the obstacle be-
tween the abattoir and the tracks of the defendant's railroad

Bigelow vs. Chicago, Burlington & Northern R. Co.

at La Crosse. It needs no evidence to show that, if he had tendered the ice upon the tracks of the defendant within that city, he could have fulfilled his sale and realized his $2 per ton. Nor does it require any evidence — although evidence there is — to establish that he might have shipped the ice from the abattoir over the Chicago, Milwaukee & St. Paul road into the city of La Crosse; and, while the expense to him is not rendered entirely certain, there is enough in the evidence to show that it must have fallen far below the $2 per ton damages which he claims. There might almost be said to be common knowledge that if the rate of carriage from La Crosse to Springfield, Ill., were $2 a ton, the rate for the few miles from the abattoir to La Crosse city would have been but a small fraction of that; and it was shown that, even if the ice needed to be changed from one car to another after reaching La Crosse, the expense of that transaction was but a trifling percentage of $2 per ton. The plaintiff offered in evidence a letter from the general freight agent of the defendant wherein it is stated, somewhat ambiguously, that a five-mile haul from the abattoir to La Crosse would, at full tariff rates, cost but three cents per hundred, or sixty cents per ton. It is also matter of common knowledge that it was physically possible to haul this ice by teams from the abattoir to some point on the defendant's tracks within two miles of it; and it appears, by plaintiff's own testimony, that some negotiation took place between him and defendant's agent with reference thereto, and he offered in evidence two letters from that agent to his superior, one stating that the ice could be hauled at from twenty-five to thirty cents per ton, and the other indicating estimates by the plaintiff himself of thirty-five cents per ton. It was, of course, the duty of the plaintiff, before allowing this ice to spoil and become entirely lost, to make every reasonable exertion to realize from it. If he could not sell to others, and could have availed himself of this sale by incurring ad-

ditional expense, it was his duty to incur that expense, so long as it was less than the damage otherwise to result; and it appearing affirmatively that he made no exertion whatever in the latter direction, and there being evidence showing that the expense thereof would have been far less than the damage now claimed to have been suffered, we think it clear that the amount of the verdict recovered is not sustained by the evidence. Whether, as shown by Mr. Danielson's letter, this ice could have been placed upon the defendant's cars on its own tracks by the use of teams at an expense of thirty cents per ton, or whether it would have cost the sixty cents for local freight tariffs over the St. Paul, the evidence is perhaps too indefinite to make clear; and we do not, therefore, feel justified in specifying a minimum to which the plaintiff, in his option, may remit, but are satisfied that the evidence shows that he might have avoided the loss of this ice, by reasonable diligence, at an expense far less than the amount of the present recovery. For that reason the verdict should have been set aside, upon defendant's motion, as not supported by the evidence, and a new trial awarded.

*By the Court.*— Judgment of circuit court reversed, and cause remanded for a new trial.