PRESIDENT AND TRUSTEES OF THE VILLAGE OF KILBOURN
CITY, Appellant, vs. SOUTHERN WISCONSIN POWER COM-
PANY, Respondent.

*March 14—April 3, 1912.*

*Public utilities: Discriminatory contracts are invalid: Evasions of
law: Evidence: Parol evidence affecting writings: Executed con-
tracts: Municipalities on same footing as other patrons: Filing
schedule of rates: Recovery for previous services: Eminent do-
main: Taking property devoted to another public use.*

1. By a contract between a village and a power company the latter,.
in consideration of being allowed to flood the land occupied by
the water and light plant of the village, agreed to purchase an-
other site and erect thereon a new plant for the village, the:
power for which should be furnished by the company and taken.
and paid for by the village at current legal and reasonable
rates, and further agreed to pay to the village certain sums.
semi-annually, to be increased at stated periods in proportion
to the increase in the population of the village, which payments.
bore a very close relation to the value of the power ·which would
be needed in the new plant.  In an action by the village to re-
cover sums so agreed to be paid by the power company, the evi-
dence is *held* to sustain a finding by the trial court that the con-
tract was in fact one for the furnishing of free power to the vil-
lage,—the provisions by which the village agreed to pay for the:
power and the company agreed to pay certain sums to the vil-
lage being inserted as a subterfuge and for the purpose of evad-
ing the public utilities law.

2. A municipal corporation which obtains its power for the opera-
tion of a municipal water and light plant from a public utility
of this state stands upon the same footing as any private con-
sumer, and under the public utilities act (ch. 499, Laws of
1907) cannot lawfully contract, directly or indirectly, for a.
more advantageous rate than other patrons are charged for like
service.

3. A discriminatory contract is not rendered valid by the fact that.
it is entered into before the public utility has completed its.
plant or commenced to do business as such.

4. The matter of regulating rates of charge by public-service cor-
porations and preventing discriminations is a governmental
function and one over which the legislature has a right to legis-

late within constitutional lines, and any contract, not made under direct legislative authority, which runs counter to a valid law in this regard becomes superseded thereby, although made before the law was enacted.

5. The public utilities act condemns all subterfuges whereby one consumer is called upon to pay a greater or lesser rate than that contained in the published schedule of charges, or whereby one consumer obtains a preference or advantage over another; and the regular schedule of rates cannot be departed from by making a contract which recites a consideration for the departure.

6. A statute authorizing a dam to be raised to a specified height and to flood such lands as will be overflowed thereby carries by implication the right to take the lands so flooded, even though they are already devoted to another public use.

7. Parol evidence is competent to show that a written contract apparently valid on its face was in fact made in contravention of a statute and for the purpose of evading its effect.

8. The rule that where a contract has been executed by one party, the other party, having received the benefit thereof, is estopped from asserting its invalidity even though it was *ultra vires* when made, has no application to a contract made in violation of a statute and hence in contravention of the lawfully declared public policy of the state.

9. Under secs. 1797m—27, 1797m—105, subd. 2, and 1797m—31 of the public utilities act, requiring schedules of rates to be filed with the railroad commission, and sec. 1797m—33, making it unlawful for a public utility "to demand, collect or receive any rate, toll or charge not specified in" the schedule of rates so required to be filed, it is the duty of a public utility to fix schedules of rates for the services it proposes to render, and file the same, before the services are performed, and it cannot recover for any service except as such service is covered by rates so filed.

APPEAL from a judgment of the circuit court for Columbia county: CHESTER A. FOWLER, Circuit Judge. *Modified and affirmed.*

By ch. 462, Laws of 1901, certain persons were authorized to build a dam across the Wisconsin river at *Kilbourn City,* to a certain specified height, and were empowered to exercise the right of condemnation given by secs. 1777 to 1777e, in-

clusive, of the Statutes of 1898. The right or franchise
granted by said act was thereafter conveyed to the defend-
ant herein, the *Southern Wisconsin Power Company*, a cor-
poration. In the fall of 1906 said corporation commenced
the construction of the dam authorized by said act. The vil-
lage of *Kilbourn City* owned a piece of land fronting on the
Wisconsin river above the site of the proposed dam, on which
was located the waterworks and electric light plant operated
by said village. In order to carry out the improvement con-
templated by the act referred to, it was necessary to flood the
land on which the said plant was located. Negotiations were
started between the plaintiff and the defendant for the pur-
pose of enabling the defendant to flood the land and at the
same time to afford adequate compensation to the plaintiff for
any damage it might sustain by reason of such flooding.
Various discussions took place between the parties and a num-
ber of propositions and counter-propositions were submitted.
At one time an agreement seems to have been reached between
the representatives of the two parties whereby the defendant
agreed to furnish power to a certain amount for the purpose
of running the electric light plant and the water power plant,
in consideration for which the village agreed to stand the ex-
pense of acquiring a new site and constructing a new plant.
This agreement fell through, apparently because the village
authorities thought that the power should be furnished in-
definitely, while the power company desired to restrict its ob-
ligation to a period of twenty-five years. The contract sub-
mitted by the power company was dated in March, 1907.

Thereafter negotiations continued without any definite re-
sult until the month of August, 1908, when a proposition was
submitted by the defendant and accepted by the plaintiff.
By this proposition the defendant agreed to raise the land
around the pumping plant for an area of 50 x 250 feet to a
height above extreme high water and to raise the wells to the
same height and to build them in such a manner as to pre-

serve the quality of the water; also to build a pump house over one of the wells and install a motor therein with a capacity equal to 500 gallons per minute, the village to pay one half of the cost of the pump and motor, but not to be called upon to pay to exceed $1,000 in the aggregate. In addition defendant through its representative offered to furnish free power for operating the water and light plants for a period of twenty-five years. All other changes required by raising the water in the dam were to be paid for by the village. This proposition provided that a formal contract was to be entered into between the parties within ten days. Some disagreements of a serious nature arose after this proposition was made and accepted, and it was withdrawn by Mr. Swenson, acting in behalf of the defendant, and the village board passed a resolution rescinding its acceptance of the same. In the meantime the village retained attorneys, and negotiations were thereafter carried on between the attorneys for the village and the power company, which did not result in bringing the parties together.

In October, 1908, the plaintiff commenced an action to enjoin the defendant from raising any head of water on its dam in such a way as to overflow or encroach upon the land of the plaintiff, and on November 24, 1908, an injunctional order was procured which enjoined the defendant during the pendency of the action from setting the waters of the Wisconsin river back so that they would overflow in any way or to any extent damage or interfere with the real estate owned by the plaintiff, or with the waterworks or electric light plant located on said real estate. At this time the work of building the dam and power plant and necessary equipment had been in progress for nearly two years. The dam was nearly completed and the power plant was well under way. When the injunction was served the defendant had nearly a million dollars invested in the improvement. It also appeared from the testimony that the money used was largely derived from the

sale of bonds, that the bonds were guaranteed by the bonding house that had negotiated the same, and that the holders thereof were threatening to compel the bonding house to take back the bonds and refund the moneys paid therefor if there was any interruption in the progress of the work. It further appeared that it would be impossible to sell any other bonds while the injunction was in force, and that it was quite probable that the enterprise would end disastrously unless the injunction was set aside. It also appeared that in order to complete the plant it was necessary to spend in the neighborhood of a million dollars in addition to that already spent, and that the bonding house had advised the defendant to get rid of the injunction on the best terms it could, but to get rid of it in any event, if such a thing were possible. With this situation confronting it, the defendant submitted as its ultimatum the contract involved in this action, which bore date February 6, 1909, and was executed by both parties.

By this contract the defendant agreed to purchase at its own expense, and cause good title thereto in fee to be vested in the plaintiff, a tract of land of such size and in such locality at or in the vicinity of the village as might be mutually selected by the parties, and the defendant also agreed to construct at its own cost and expense all the wells and reservoirs and make all the necessary improvements to the land thus selected and purchased to derive therefrom an adequate supply of water for the use of the plaintiff and its inhabitants for all purposes, which water should equal in quantity and sanitary quality that derived from the present waterworks plant of the plaintiff. Defendant also agreed to make the necessary connection between the waterworks established upon such new locality and the present distribution system and water tower of the plaintiff, and that the improvements to be placed in such new location should constitute a complete electrically driven waterworks pumping plant ready for operation, with improvements, together with wells and reservoirs,

the same to be made and constructed in accordance with the plans mutually agreed upon.   It further provided that the quality of the water was to be determined by tests made by the state hygienic laboratory of Wisconsin.   Defendant also agreed to make the necessary connections between its power plant and the new waterworks and electric light plant so as to carry current thereto.   By this contract defendant further agreed to raise certain streets in the village and to keep the same in repair for a stipulated time, and to build a new concrete bridge over what was designated as Barney's Run, not less than nine feet above the ordinary stage of water; also to protect the abutment of the bridge at Superior street.   It was further provided that all the old machinery, pumps, boilers, motors, switchboards, buildings, and other apparatus on the present waterworks plant, after the new one was in operation, should belong to the plaintiff and should be removed and sold by it.   In addition to the foregoing the defendant agreed to pay to the plaintiff from the time of the completion of the dam and the commencement of the operation of its plant, but not later than January 1, 1910, and as long as said dam was maintained in the Wisconsin river, the sum of $3,500 for each and every year of the first five years and for each succeeding term of five years continuously thereafter the sum of $3,500 per year, together with a sum annually in addition thereto equal to $250 for each additional hundred persons or major portion thereof of the increase in the population of said village of *Kilbourn City* above 1,200, as shown by the next census, state or national, after the expiration of each five-year term, but in no event should the annual payments be less than $3,500 nor more than $4,500.   It was further provided that said payments should be made semi-annually, beginning six months after the time of the commencement of the operation of the power plant, but not later than January 1, 1910.

On its part the plaintiff granted to the defendant the right to overflow the lands on which the old waterworks plant was

situated, and it was further agreed in the contract that the defendant should furnish and the plaintiff should take from the power plant of the defendant, at current legal and reasonable rates, sufficient power to operate the waterworks pumping plant, and also a sufficient amount of electric current for supplying the plaintiff and its inhabitants with such light, heat, and power as may be obtained from an ordinary fixture.

The power plant was completed on August 6, 1909, and the first semi-annual payment of $1,750 became due and payable under the contract on February 6, 1910, and this action was brought for the recovery of the same. The answer in substance set forth that the contract was unenforceable because void under the public utilities law and for other reasons. The defendant interposed a counterclaim, alleging that it furnished certain current to the plaintiff by virtue of the aforesaid contract, and that there was due it from plaintiff on account of the current so furnished the sum of $1,928.08.

The circuit court found in substance and effect that the real contract entered into between the parties was a contract for furnishing free power to the plaintiff, and that the provision in the contract whereby the defendant obligated itself to pay the amounts specified and whereby the plaintiff agreed to purchase and pay for power, were inserted therein as a subterfuge and for the purpose of avoiding the provisions of the public utilities law. The court as a conclusion of law held that the contract was void as against public policy and because it contravened the provisions of the law referred to, and denied plaintiff any relief on the cause of action set forth in the complaint. It also gave judgment to the defendant on its counterclaim for the amount demanded therein. From this judgment plaintiff appeals.

For the appellant there was a brief by *Cary, Upham & Black,* and oral argument by *W. E. Black.* They contended, *inter alia,* that the contract is plain and must speak for itself without the aid of extrinsic evidence. *Klueter v. Joseph*

*Schlitz B. Co.* 143 Wis. 347, 128 N. W. 43; *Zohrlaut v. Mengelberg,* 144 Wis. 564, 124 N. W. 247, 128 N. W. 975. Evidence of oral conversations was not admissible to explain or give character to it. *Steele v. Schricker,* 55 Wis. 134, 12 N. W. 396; *Excelsior W. Co. v. Messinger,* 116 Wis. 549, 93 N. W. 459; *Loree v. Webster Mfg. Co.* 134 Wis. 173, 114 N. W. 449; *Hackley Nat. Bank v. Barry,* 139 Wis. 96, 120 N. W. 275. A lawful construction, being possible, should be adopted. *Irish v. Dean,* 39 Wis. 562; *Voechting v. Grau,* 55 Wis. 312, 13 N. W. 230; *Hicks P. Co. v. Wis. Cent. R. Co.* 138 Wis. 584, 120 N. W. 512. There was an adequate consideration for the annual payments. *Wood v. Boynton,* 64 Wis. 265, 25 N. W. 42; *Rust v. Fitzhugh,* 132 Wis. 549, 112 N. W. 508; 9 Cyc. 365. Defendant is estopped to deny the validity of the contract on the ground of *ultra vires.* *Madison v. Am. S. E. Co.* 118 Wis. 480, 95 N. W. 1097; *Ricketson v. Milwaukee,* 105 Wis. 591, 81 N. W. 864; *McElroy v. Minn. P. H. Co.* 96 Wis. 317, 71 N. W. 652; *Security Nat. Bank v. St. Croix P. Co.* 117 Wis. 211, 94 N. W. 74; *John V. Farwell Co. v. Wolf,* 96 Wis. 10, 70 N. W. 289, 71 N. W. 109; *Emigh v. Earling,* 134 Wis. 565, 115 N. W. 128. Except as to paragraph "K," which was separable from the rest, the contract was not subject to the public utilities act. As against defendant's right to recover on its counterclaim, they cited *Strauss v. Am. Exp. Co.* 3 Wis. R. R. Comm. 556; *Kiel W. W. Co. v. C., M. & St. P. R. Co.* 3 Wis. R. R. Comm. 597; *Whittet v. C., M. & St. P. R. Co.* 4 Wis. R. R. Comm. 480; *Beaver Dam L. Co. v. C., St. P., M. & O. R. Co.* 2 Wis. R. R. Comm. 700; *George L. Munroe & Sons v. Mich. Cent. R. Co.* 17 Int. Comm. Comm. 27; *Tioga C. Co. v. C., R. I. & P. R. Co.* 18 Int. Comm. Comm. 414.

For the respondent there was a brief by *Jones & Schubring,* and oral argument by *B. W. Jones* and *E. J. B. Schubring.* They cited, among other authorities, *Melchoir v. McCarty,* 31 Wis. 252; *Pearson v. Kelly,* 122 Wis. 660, 100 N. W. 1064;

*Clarke v. Lincoln L. Co.* 59 Wis. 655, 18 N. W. 492; *Cohn v. Heimbauch,* 86 Wis. 176, 56 N. W. 638; *Indianapolis, D. & S. R. Co. v. Ervin,* 118 Ill. 250, 8 N. E. 862; *Twentieth Century Co. v. Quilling,* 130 Wis. 318, 110 N. W. 174; *Lepley v. Andersen,* 142 Wis. 668, 125 N. W. 433; *Corbett v. Joannes,* 125 Wis. 370, 104 N. W. 69; *U. S. v. C. & A. R. Co.* 148 Fed. 646, 156 Fed. 558; *U. S. v. C., I. & L. R. Co.* 163 Fed. 114; *Wis. Cent. R. Co. v. U. S.* 169 Fed. 76; *U. S. ex rel. Pitcairn C. Co. v. B. & O. R. Co.* 165 Fed. 113; *Wight v. U. S.* 167 U. S. 512, 17 Sup. Ct. 822; *Armour P. Co. v. U. S.* 209 U. S. 56, 28 Sup. Ct. 428; *New York, N. H. & H. R. Co. v. Interstate Comm. Comm.* 200 U. S. 361, 26 Sup. Ct. 272; *Union Pac. R. Co. v. Goodridge,* 149 U. S. 680, 13 Sup. Ct. 970; *State v. Union Pac. R. Co.* 87 Neb. 29, 126 N. W. 859; *Louisville & N. R. Co. v. Mottley,* 219 U. S. 467, 31 Sup. Ct. 265; *Hicks P. Co. v. Wis. Cent. R. Co.* 138 Wis. 584, 120 N. W. 512; *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530.    They also contended that, the contract being void, defendant was entitled to recover upon its counterclaim on *quantum meruit,* citing *Cohen v. Stein,* 61 Wis. 508, 21 N. W. 514; *Salb v. Campbell,* 65 Wis. 405, 27 N. W. 45; *Wojahn v. Nat. Union Bank,* 144 Wis. 646, 129 N. W. 1068; *Chase v. Hinkley,* 126 Wis. 75, 105 N. W. 230; *Koch v. Williams,* 82 Wis. 186, 52 N. W. 257; *Draheim v. Evison,* 112 Wis. 27, 87 N. W. 795; *Miller v. Des Moines,* 143 Iowa, 409, 122 N. W. 226; *Concordia v. Hagaman,* 1 Kan. App. 35, 41 Pac. 133; *Call P. Co. v. Lincoln,* 29 Neb. 149, 45 N. W. 245; *Nicholasville W. Co. v. Nicholasville,* 18 Ky. Law Rep. 592, 36 S. W. 549, 38 S. W. 430; *Ford v. Cartersville,* 84 Ga. 213, 10 S. E. 732.

BARNES, J.    The contention of the appellant most elaborately argued was that the evidence failed to support the findings of fact to the effect that the provisions of the contract by which the plaintiff agreed to buy power at legal rates and

the defendant agreed to pay the plaintiff a sum of not less than $3,500 nor more than $4,500 per year, depending on increase of population, were inserted in the contract to enable the plaintiff to obtain free power contrary to law and were adopted as a subterfuge to cover up the real purpose of enabling the plaintiff to obtain free power, and that the contract in fact was an agreement for free power to the extent of the sum agreed to be paid by defendant.

The evidence is ample to sustain these findings. A general outline of the negotiations between the parties is given in the statement of facts. It would not serve any useful purpose to recite the evidence in detail. From the beginning of the negotiations the plaintiff insisted on exemption from payment for such current as it might use. Strictly speaking, the earlier negotiations did not contemplate that the power should be free, in the sense that no consideration was to be paid for it, because the village was to meet the expenses of building a new plant. But the dominant idea seems to have been that it wished to avoid the payment of the usual compensation for the power used. When it broadened out its demand its purpose was to avoid paying any actual consideration for current. It demanded that a new site and a fully equipped plant be furnished it at least as good as the old one, and that it be put in running order without any expense to the village, and it wanted free power besides. The question of the competency of the parties to contract for free power seems to have arisen as early as October 17, 1908. The minutes of a meeting of the village board held on that day show that an inquiry was made by the president of the board of Mr. Upham, one of the attorneys for the village, whether in a settlement between the village and the power company the use of free power on the part of the village could be legally accepted and safeguarded, and that Mr. Upham gave as his opinion that it could. The minutes of the board under date of November 16, 1908, show that at the meeting of the board held on that date

"Mr. Upham stated that as the law would prohibit the accepting of free power, the company would have to pay so much rental and the village pay for the power used. The counsel to arrange this matter." Mr. Swenson, president of the power company, testified, without contradiction, that it was agreed between the attorneys that free power was illegal and therefore the rental was provided to take its place, and that such a provision was supposed "to be just a good equivalent to what free power would amount to; in other words, we considered it an offset." He further testified that the amount of power necessary for use would increase with the increase in population and that the increase in rental provided for was intended to take care of that contingency. It also appears that the amount of rental provided for in the contract was about as nearly equal to the value of the power furnished as it was practicable to estimate in advance. The value of the power supplied from November 22, 1909, to July 1, 1910, was $1,928.08, or an average of $265.33 per month, which would make $3,183.96 per year, as against $3,500 rental which defendant agreed to pay plaintiff. This period took in the winter months, when undoubtedly less pumping was done than in the summer. The average monthly value of the current furnished for the four months from December 1 to March 31 was $218.62, and of the three succeeding months $330.16. This might be the result of a coincidence merely, but it is somewhat suggestive of the fact that the parties made a pretty close estimate of what the current consumed would cost and accordingly fixed the rental which the defendant was obliged to pay. There are other circumstances to support the conclusions arrived at by the circuit judge, but enough has been said to demonstrate that there is plenty of evidence to sustain the findings. Indeed, it would be difficult to draw any different inference from the established facts.

Was the court right in concluding as a matter of law that

the contract was void because contrary to the provisions of our public utilities act, ch. 499, Laws of 1907 ?    The defendant is a public utility and subject to that law, which was in force when the contract was made.    Such law contains the following provisions:

Sec. 1797m—33.    "It shall be unlawful for any public utility to charge, demand, collect or receive a greater or less compensation for any service performed by it within the state or for any service in connection therewith than is specified in such printed schedules, including schedules of joint rates, as may at the time be in force, *or to demand, collect or receive any rate, toll or charge not specified in such schedule.*    The rates, tolls and charges named therein shall be the lawful rates, tolls and charges until the same are changed as provided in this act."

Sec. 1797m—89.    "If any public utility . . . shall, directly or indirectly, by any device whatsoever or otherwise, charge, demand, collect or receive from any person, firm or corporation a greater or less compensation for any service rendered or to be rendered by it in or affecting or relating to the production, transmission, delivery or furnishing of heat, light, water or power . . . than that prescribed in the published schedules or tariffs . . . , than it charges, demands, collects or receives from any other person, firm or corporation for a like and contemporaneous service, such public utility shall be deemed guilty of unjust discrimination which is hereby prohibited and declared to be unlawful."

Sec. 1797m—91.    "If any public utility make or give any undue or unreasonable preference or advantage to any particular person, firm or corporation . . . such public utility shall be deemed guilty of unjust discrimination which is hereby prohibited and declared unlawful."

Sec. 1797m—92.    "It shall be unlawful for any person, firm or corporation knowingly to solicit, accept or receive any rebate, concession or discrimination in respect to any service in or affecting or relating to the production, transmission, delivery or furnishing of heat, light, water or power . . . or for any service in connection therewith whereby any such service shall, by any device whatsoever, or otherwise, be rendered free,

or at less rate than that named in the published schedules and tariffs in force as provided herein, or whereby any service or advantage is received other than is herein specified."

It could hardly be claimed under these sections of the public utilities law that a utility could by resorting to any device or subterfuge make a valid agreement with a consumer to furnish the latter with free current to the amount of $3,500 per year, and the appellant does not so claim. Some of the main purposes of this law were to compel public-service corporations to file their rates so that they would be open to public inspection, to make reasonable rates of charge, and to make one consumer pay the same as another where the service was furnished under substantially similar conditions. To accomplish these results, the language used is as broad and comprehensive as it could well be made. Individual cases may arise where the legislature might possibly have made an exception had the concrete case been in mind when the act was passed. But the courts cannot write these exceptions into the law. We must enforce it as we find it. The village of *Kilbourn* is one of the patrons of the defendant that is entitled to receive the same consideration in the matter of rates of charge that any other patron is entitled to receive; no less, no more. By taking advantage of a situation where it was able to force the defendant into making an unlawful contract, it can no more profit thereby than could any other purchaser of current from the defendant. It is in the same situation that any private riparian owner would be who thought he had an opportunity to drive a hard bargain.

Counsel for appellant argue that the provisions of law referred to have no application to the case, because the defendant's plant was not completed when the contract was made and the defendant was not then a public utility, and that it is only contracts between public utilities and the public that are prohibited. We cannot adopt this view. If it is correct, then any projected railroad could, at any time before the road

actually commenced to serve the public, enter into perpetual contracts whereby certain shippers were favored. Any new telephone or electric light or water company could make all kinds of discriminating contracts before they actually began to serve the public. It is the duty of any new utility to make its schedule of rates and file it with the railroad commission at or before the time it commences to do business. Sec. 1797m—33. The matter of regulating rates of charge by public-service corporations and preventing discriminations is a governmental function and one over which the legislative branch of the government has a right to legislate within constitutional lines, and any contract which runs counter to a valid law in this regard, and that was not made under direct legislative authority, becomes superseded thereby, regardless of whether it is made before or after the law is enacted. This subject was fully considered in *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925. Of course the defendant had the power to contract to buy and the plaintiff the power to contract to sell the right to overflow the land of the latter, and they had the right to agree on the compensation to be paid, but they did not have the right to agree that full compensation should be made, and that in addition thereto the plaintiff should receive annually from $3,500 to $4,500 worth of free power. All subterfuges whereby one consumer is called upon to pay a greater or a lesser rate than that prescribed in the published schedule of charges, or whereby one consumer obtains a preference or advantage over another, are condemned. The scope, effect, and purpose of the law is considered at length in *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530, and it is unnecessary to elaborate or repeat what is there said. The matter of giving concessions in rates in settlement of a claim for unliquidated damages was considered in *Union Pac. R. Co. v. Goodridge,* 149 U. S. 680, 13 Sup. Ct. 970, and it was held that such a contract was in violation of the interstate commerce act. Other

cases holding that parties dealing with public-service corporations must pay the regular schedule of rates for the service performed and that these rates cannot be departed from by making a contract which recites a consideration for the departure, are *Louisville & N. R. Co. v. Mottley,* 219 U. S. 467, 476, 31 Sup. Ct. 265; *Wight v. U. S.* 167 U. S. 512, 17 Sup. Ct. 822; *U. S. v. C. & A. R. Co.* 148 Fed. 646; *U. S. v. C., I. & L. R. Co.* 163 Fed. 114; *U. S. v. B. & O. R. Co.* 165 Fed. 113; *Interstate Comm. Comm. v. Reichmann,* 145 Fed. 235; *Armour P. Co. v. U. S.* 209 U. S. 56, 28 Sup. Ct. 428. Through a rigid enforcement of our laws, state and national, favoritism to the few by public utilities in the matter of rates has been very largely done away with, and the courts should be sure they are right before placing an interpretation on statutes dealing with rates of charge which would encourage a return to the old order of things.

Heretofore it has been said that the court should treat this contract as it would a like contract made between the defendant and a private riparian owner. Plaintiff does not concede this to be true, because it argues that there was no right of condemnation against the village. The defendant had the right to condemn the property owned by the village. The right to condemn property devoted to one public use for a different use exists (1) where such right is expressly given by statute; (2) where it arises by necessary implication from the powers and privileges granted; and (3) where the privileges granted cannot be beneficially exercised without the taking of the property already devoted to a public use. *In re Milwaukee Southern R. Co.* 124 Wis. 490, 501, 102 N. W. 401. It is apparent that the privileges granted by ch. 462, Laws of 1901, could not be beneficially exercised without encroaching upon the property of the plaintiff, and the power to raise a dam to a specified height and to flood such lands as would be overflowed thereby carried by implication the right to take the lands so flooded. This situation deprived the plaintiff of

the strategic advantage of being able to prevent any occupation of its property against its will and of being able to retain the use of it unless it could obtain whatever price it saw fit to demand as compensation therefor.

Some reference has heretofore been made to the parol evidence given by Mr. Swenson. The appellant urges that this evidence was incompetent because it tended to vary the terms of a written contract. If the testimony of Mr. Swenson were excluded from consideration, there is plenty of competent evidence to sustain the finding of the trial court. But we do not think the evidence was incompetent where the issue was whether a contract apparently valid on its face was in fact made in contravention of a statute of the state and for the purpose of evading such statute in fact though not in form. *Lepley v. Andersen,* 142 Wis. 668, 125 N. W. 433; *Twentieth Century Co. v. Quilling,* 130 Wis. 318, 325, 110 N. W. 174; *Corbett v. Joannes,* 125 Wis. 370, 104 N. W. 69.

Appellant contends that the contract has been executed on its part and that defendant has received the benefit thereof and that it is estopped from asserting its invalidity, even though it was *ultra vires* when made. In support of this proposition the following cases are cited: *Madison v. Am. S. E. Co.* 118 Wis. 480, 95 N. W. 1097; *Ricketson v. Milwaukee,* 105 Wis. 591, 81 N. W. 864; *McElroy v. Minn. P. H. Co.* 96 Wis. 317, 71 N. W. 652; *John V. Farwell Co. v. Wolf,* 96 Wis. 10, 70 N. W. 289, 71 N. W. 109; *Lewis v. Am. S. & L. Asso.* 98 Wis. 203, 73 N. W. 793; *Bigelow v. C., B. & N. R. Co.* 104 Wis. 109, 80 N. W. 95; *Interior W. Co. v. Prasser,* 108 Wis. 557, 84 N. W. 833; *Security Nat. Bank v. St. Croix P. Co.* 117 Wis. 211, 94 N. W. 74; *Emigh v. Earling,* 134 Wis. 565, 115 N. W. 128.

The rule invoked has no application to a contract made in violation of a statute and that is therefore in contravention of the lawfully declared public policy of the state. In such a case the party who has not performed and who is sued for the

breach of his contract can avail himself of its illegality. *Clarke v. Lincoln L. Co.* 59 Wis. 655, 18 N. W. 492; *Cohn v. Heimbauch,* 86 Wis. 176, 180, 56 N. W. 638; *Pearson v. Kelly,* 122 Wis. 660, 100 N. W. 1064; *Sentinel Co. v. A. D. Meiselbach M. W. Co.* 144 Wis. 224, 128 N. W. 861; *Menominee River B. Co. v. Augustus Spies L. & C. Co.* 147 Wis. 559, 132 N. W. 1118.

The defendant did not file its schedule of rates with the railroad commission until July 20, 1910. It counterclaimed for the reasonable value of the current furnished plaintiff up to June 27, 1910. The appellant contends that no recovery should be allowed because of failure of defendant to seasonably file its schedule of rates. The circuit court held that the defendant was entitled to recover *quantum meruit* for the service rendered and awarded judgment in favor of the defendant for $1,928.08 for such service. The public utilities law contains the following provisions in addition to those already referred to:

Sec. 1797m—27. "Every public utility shall file with the commission within a time to be fixed by the commission, schedules which shall be open to public inspection, showing all rates, tolls and charges which it has established and which are in force at the time for any service performed by it within the state, or for any service in connection therewith or performed by any public utility controlled or operated by it. The rates, tolls and charges shown on such schedules shall not exceed the rates, tolls and charges in force April 1, 1907."

Sec. 1797m—105, subd. 2. "Every public utility in this state shall, within thirty days after the passage and publication of this act, file in the office of the commission, copies of all schedules of rates and charges including joint rates, in force on the first day of April, 1907, and all rates in force at any time subsequent to said date."

Sec. 1797m—31. "No change shall thereafter be made in any schedule, including schedules of joint rates, except upon ten days' notice to the commission, and all such changes shall be plainly indicated upon existing schedules, or by filing new schedules in lieu thereof ten days prior to the time the same are to take effect."

Under these provisions utilities that were in operation at the time the act was passed were required to file their schedule of rates not later than thirty days after its publication. As to a public utility coming into existence after the law was passed, we think the law clearly contemplates that schedules of rates shall be fixed for the services which it proposes to render, before the services are performed, and that the schedule so fixed shall be immediately filed with the railroad commission.

Sec. 1797m—33 makes it unlawful for a public utility *"to demand, collect or receive any rate, toll or charge not specified in"* the schedule of rates required to be filed. We are not very much impressed with the argument that this provision has reference only to such utilities as file their schedule of rates as required by law. We think the legislature has in effect said to public utilities, you must file your schedule of rates, you must charge what the schedule provides, and you may not charge anything unless you comply with the law. There is some force in the claim that this construction permits discrimination, one of the things that the statute was designed to prevent. While public-service corporations sometimes indulge in discriminations, their generosity seldom goes so far as to serve customers for nothing, and the legislature may well have thought that the best way to secure compliance with the law in the matter of filing schedules was to prohibit the recovery of compensation until such schedules were filed. In case there should be any disposition to take advantage of this requirement of the law, in order to discriminate between consumers, sec. 1797m—95 provides a penalty of not less than $100 nor more than $1,000 for each violation of the law. Taking the ordinary and obvious meaning of the language used, it prohibits a recovery for any service except as such service is covered by rates filed with the railroad commission. We cannot read out of the act any different intention on the part of the legislature.

*By the Court.*—The judgment appealed from is modified by striking therefrom the provision that the defendant recover of the plaintiff on its counterclaim the sum of $1,928.08 with interest thereon from June 27, 1910. In all other respects the judgment is affirmed. Costs in this court are awarded against the respondent.

MARSHALL and KERWIN, JJ., took no part.