[No. 13081. *En Banc.* July 29, 1916.]

RAYMOND LUMBER COMPANY, *Respondent*, v. RAYMOND LIGHT & WATER COMPANY et al., *Appellants.*[1]

CONSTITUTIONAL LAW—LEGISLATIVE POWERS—POLICE POWERS—PUBLIC SERVICE CORPORATIONS—REGULATION. The regulation of the rates of a public service water company is within the police power of the state and has been conferred upon the public service commission.

WATERS AND WATER COURSES—CONTRACTS — REGULATION — SUBSEQUENT LEGISLATION. A contract for a water supply made by a public service corporation, being upon a subject within the police power, is entered into with a view of the continuing power of control by the state; and though valid when made, may be abrogated by the public service commission's rates, established pursuant to subsequent legislation.

CONSTITUTIONAL LAW—POLICE POWER. The police power of the state is not a delegated but a reserved power.

SAME—OBLIGATION OF CONTRACT. The Federal inhibition against laws impairing the obligation of a contract is not applicable to legislation within the scope of the police power.

WATERS AND WATER COURSES—PUBLIC SUPPLY—RATES — REGULATION—CONTRACTS—ABROGATION — POWER OF PUBLIC SERVICE COMMISSION. The public service commission law does not operate to terminate contracts for the supplying of water in force at the date of its taking effect, or upon the taking effect of schedules fixed by the public service commission, but it does confer power on the commission to order the parties to terminate such contracts, by Rem. 1915 Code, § 8626-34, providing that nothing in the public service commis-

[1]Reported in 159 Pac. 133.

sion act shall prevent certain public service corporations from continuing to furnish product under any contract in force when the act was passed, provided, that the public service commission shall have power to direct by order that such contract shall be terminated, and provided further, that the commission shall have no power to terminate any contract for the furnishing of water based upon a consideration passing at the time of the execution of such contract.

CONSTITUTIONAL LAW—POLICE POWER—LIMITATION BY CONTRACT. The right of the state to exercise its police power cannot be limited by private contract.

SAME—DUE PROCESS.  The termination of a contract for a water supply, by notice from the company upon order by the public service commission, is not a violation of the due process clause of the Federal constitution, where the water user had the right to bring an action to test the validity of the contract as to whether it was discriminatory, that being due process, and the law not requiring any notice or opportunity to be heard before the commission.

WATERS AND WATER COURSES—PUBLIC SUPPLY—RATES — REGULATION—PROCEEDINGS.  Upon a complaint charging a water company with unreasonable and excessive rates and inadequate service, the public service commission has power to order a contract with a consumer to be terminated, when it appears in the course of the investigation that such consumer's contract required the furnishing of water at less than the tariff rate, making the company's receipts substantially smaller.

Appeal from a judgment of the superior court for King county, Smith, J., entered June 18, 1915, upon findings in favor of the plaintiff, in an action for equitable relief, tried to the court.  Reversed.

*The Attorney General* and *Scott Z. Henderson, Assistant,* and *Murphy & Lee (C. H. Fuqua,* of counsel), for appellants.

*Corwin S. Shank* and *H. C. Belt,* for respondent.

MAIN, J.—This action was brought for the purpose of restraining the Raymond Light & Water Company, a public service corporation, from denying to the plaintiff the right to receive water from that company in accordance with the rate fixed in a contract between the two companies, and for the purpose of recovering the excess payments for water over the contract rate, which payments had been made prior

to the institution of the action.  Before the case was tried, the public service commission became a party by intervention. The trial of the cause resulted in a money judgment for what the plaintiff claimed to be the excess water payments, and also for the injunctive relief prayed for.  From this judgment, the defendants and the public service commission appeal.

The facts are briefly these:  During the year 1905, the then village of Raymond contained three hundred inhabitants. During the month of September of that year, Charles L. Lewis and Edward Hulbert, being desirous of securing a location for a sawmill, visited Raymond with this object in view. As a result of this visit, three contracts were entered into, one on September 9, 1905, between the Raymond Light & Water Company, a corporation, and Charles L. Lewis and Edward Hulbert.  By this contract that corporation agreed to furnish water necessary for the use and operation of a sawmill to be thereafter erected and operated by Lewis and Hulbert, for a period of forty years at the rate of $5 per month for each and every steam boiler contained in the mill.

On the same date, a contract was made between Stella J. Raymond and Leslie V. Raymond, her husband, and Lewis and Hulbert, by which, for a consideration of $1, the Raymonds agreed to convey to Lewis and Hulbert, a tract of land consisting of approximately nineteen acres, for a mill site.  At about the same time, and at least not later than the 11th day of September of the same year, the Raymond Land & Improvement Company, a corporation, contracted with Lewis and Hulbert that, if they would locate and operate a mill upon the site covered by the contract with Stella J. Raymond and her husband, that company would build, or cause to be built, a spur track, leading from the line of the Northern Pacific Railway Company, which passed through Raymond, to the site upon which the mill was to be erected. Thereafter the mill was erected, and in accordance with the agreement the mill site was conveyed.

For a period of about seven years, the Raymond Light & Water Company continued to furnish water to the mill, as provided in its contract with Lewis and Hulbert.

During the month of August, 1912, the city of Raymond, by its proper authorities, filed a complaint against the Raymond Light & Water Company with the public service commission, charging that the rates of the water company were unreasonable and excessive, and alleging that the supply of water furnished by the water company to the citizens of Raymond was inadequate and insufficient. The Raymond Light & Water Company answered the complaint and alleged that, under the existing rates, its returns upon its investment were insufficient, and that it had spent large sums of money in furnishing the city of Raymond with a water supply and intended to still further extend and expand its system and plant.

Thereafter, and during the month of February, 1913, a hearing was had before the public service commission upon the issues thus raised by the complaint and answer. During this hearing, it developed that the water company had been furnishing water to the Raymond Lumber Company, which had succeeded to the rights of Lewis and Hulbert under their contract with the water company, at the rates specified in that contract. The rate at which the Lumber Company received water was less than that charged to other water users, except that one or more other mills received water at the same rate as the Raymond Lumber Company. The public service commission found that the rates charged the Raymond Lumber Company and the other mill companies were discriminatory, and ordered that the water company terminate the contracts with the mill companies, including the Raymond Lumber Company. Thereafter, the water company installed a meter upon the pipe leading to the Raymond Lumber Company's plant, and notified that company that it would be required to pay for water in accordance with the water company's published rules and tariff.

After this notice, for a period of about twenty-three months before the institution of the present action, the Raymond Lumber Company paid the tariff rate for water, most of the time under protest. The difference between the sum which it would have paid under the contract and that which it paid under the tariff rate was approximately $2,218.95. This is the item for which a money judgment was entered in this action.

The principal question in the case is whether the public service commission had power to direct the water company to cease to furnish water under the contract and charge for the same at its published tariff rate.

By the public service commission law (Laws of 1911, ch. 17, p. 54; Rem. 1915 Code, § 7493-1), the public service commission therein created is given jurisdiction to determine the rate that shall be charged, and the service that shall be rendered by public service corporations, including water companies. This act was passed subsequent to the time when the water contract under which the Raymond Lumber Company is claiming was executed. Hence, at the time the contract was entered into, the parties thereto had a right to contract with reference to the rate.

In the briefs there is considerable controversy over whether this water contract is a mutual obligation; and also whether the other two contracts could have any bearing when considering the validity of the water contract. Without following this discussion, so far as the decision of this case is concerned, it will be assumed, but not decided, that there was a consideration for the water contract at the time it was entered into, and that the contract, at the time, was a valid obligation between the parties.

The question then arises, if the contract was valid at the time it was entered into, can it be terminated under the provisions of the public service commission law subsequently passed. As already stated, the water company was a public service corporation, and jurisdiction over its rates and serv-

ice was conferred by the public service commission law upon the public service commission. The power to regulate and control the rates of public service corporations is within the legitimate exercise of the police power of the state. This power may be exercised by the legislature itself by enacting a law fixing rates, or the legislature may delegate the power to fix rates to a properly constituted commission, subject to judicial review. *State ex rel. Webster v. Superior Court*, 67 Wash. 37, 120 Pac. 861. In this state, the legislature has conferred the rate making power upon the public service commission by the public service commission law.

It is contended that even though the state under its police power may fix the rates to be charged by public service corporations, notwithstanding this fact, a contract valid when entered into is not subject to be abrogated under the provisions of a law subsequently enacted. This contention cannot be sustained. The rule is that contracts upon subjects which are within the police power, even though valid when made, must be taken to have been entered into in view of the continuing power of the state to control the rates to be charged by public service corporations. *Portland R., Light & Power Co. v. Railroad Commission of Oregon*, 229 U. S. 397; *Milwaukee Elec. R. & Light Co. v. Railroad Commission of Wisconsin*, 238 U. S. 174; *Chicago, B. & Q. R. Co. v. Nebraska ex rel. Omaha*, 170 U. S. 57; *Louisville & N. R. Co. v. Mottley*, 219 U. S. 467, 34 L. R. A. (N. S.) 671; *Philadelphia, B. & W. R. Co. v. Schubert*, 224 U. S. 603; *City of Dawson v. Dawson Tel. Co.*, 137 Ga. 62, 72 S. E. 508; *Atlanta & W. P. R. Co. v. Camp*, 130 Ga. 1, 60 S. E. 177, 124 Am. St. 151, 15 L. R. A. (N. S.) 594; *Texas & P. R. Co. v. Scott*, 77 Fed. 726, 37 L. R. A. 94; *Manitowoc v. Manitowoc & Northern Traction Co.*, 145 Wis. 13, 129 N. W. 925, 140 Am. St. 1056; *Milwaukee Elec. R. & Light Co. v. Railroad Commission of Wisconsin*, 153 Wis. 592, 142 N. W. 492, Ann. Cas. 1915 A. 911; *Kenosha v. Kenosha Home Tel. Co.*, 149 Wis. 338, 135 N. W. 848; *President etc. Village*

of *Kilbourn v. Southern Wisconsin Power Co.*, 149 Wis. 168,
135 N. W. 499; *United Fuel Gas Co. v. Public Service Com-
mission*, 73 W. Va. 571, 80 S. E. 931.

In the *Portland R., Light & Power Co.* case, it appears
that this railway company had a system of street railways in
the city of Portland; and also two or more interurban lines
entering the same city, and connecting with its street rail-
way systems.  Upon one of these interurban lines, a ten-cent
fare was charged to what was known as Milwaukie station.
On the other line, a five-cent fare was charged to what was
known as Lents.  The distance of these two stations from the
city were approximately the same and the conditions similar.
The rates charged were found to be discriminatory.  The
lesser rate was sought to be justified because, at the time the
Portland railway company acquired a portion of the Lents
line, it contracted that the rate upon that line should be five
cents.  The contract was valid when made.  The question
there was whether the railroad commission, acting under a
law subsequently passed, had the power to order that the
contract be abrogated.  In the course of the opinion it was
said:

"The contract set up by which the fares from Lents were
required to be not greater than five cents cannot be held to
justify the discrimination, as such contracts must be taken
to have been made in view of the continuing power of the
state to control the transportation rates of common carriers
subject to its jurisdiction."

The reason for this rule is that, if contracts, valid when
made, covering a subject-matter within the police power, are
not subject to the subsequent exercise of that power on the
part of the state, it would place in the hands of individuals
the power to withdraw from the state the right to subse-
quently exercise its police power.

In the *Philadelphia, B. & W. R. Co.* case, it was said:

"The power of congress, in its regulation of interstate commerce, and of commerce in the District of Columbia and in the Territories, to impose this liability, was not fettered by the necessity of maintaining existing arrangements and stipulations which would conflict with the execution of its policy. To subordinate the exercise of the Federal authority to the continuing operation of previous contracts, would be to place, to this extent, the regulation of interstate commerce in the hands of private individuals and to withdraw from the control of Congress so much of the field as they might choose by prophetic discernment to bring within the range of their agreements. The constitution recognizes no such limitation. It is of the essence of the delegated power of regulation that, within its sphere, Congress should be able to establish uniform rules, immediately obligatory, which as to future action should transcend all inconsistent provisions."

In the *Louisville & N. R. Co.* case, quoting Judge Cooley with approval, it was said:

"If the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose. No doctrine to that effect would be even plausible, much less sound and tenable."

It will be noticed that two of the cases cited and quoted from are based upon the commerce clause of the Federal constitution. But the principle is the same. The commerce clause of the constitution is a delegation of power to the United States. The Federal supreme court holds that contracts valid when entered into are made subject to the subsequent exercise of the power of congress. The police power of the state is not a delegated, but a reserved power. The cases of *Chicago, B. & Q. R. Co. v. Nebraska ex rel. Omaha* and *Milwaukee Elec. R. & Light Co. v. Railroad Commission of Wisconsin, supra,* are cases involving the exercise of the police power of the state; and the rule is the same whether the contract be one which is within the com-

merce clause of the Federal constitution, or one which is within the police power of the state. In one case, it is subject to the laws subsequently passed by congress; and in the other, it is subject to the laws subsequently passed by the state legislature. The clause of the Federal constitution which provides that no law shall be passed which impairs the obligation of a contract is not applicable to legislation within the scope of the police power. In the *Chicago, B. & Q. R. Co.* case, it was said:

"Usually, where a contract, not contrary to public policy, has been entered into between parties competent to contract, it is not within the power of either party to withdraw from its terms without the consent of the other; and the obligation of such a contract is constitutionally protected from hostile legislation. Where, however, the respective parties are not private persons, dealing with matters and things in which the public has no concern, but are persons or corporations whose rights and powers were created for public purposes, by legislative acts, and where the subject-matter of the contract is one which affects the safety and welfare of the public, other principles apply. Contracts of the latter description are held to be within the supervising power and control of the legislature when exercised to protect the public safety, health and morals, and that clause of the Federal constitution which protects contracts from legislative action cannot in every case be successfully invoked. The presumption is that when such contracts are entered into it is with the knowledge that parties cannot, by making agreements on subjects involving the rights of the public, withdraw such subjects from the police power of the legislature."

In *Cowley v. Northern Pac. R. Co.*, 68 Wash. 558, 123 Pac. 998, 41 L. R. A. (N. S.) 559, property had been conveyed to that company during the year 1898. As a consideration for the conveyance, the railway company agreed to issue and deliver annual passes to the plaintiff and his wife during the natural life of each, and to their five children for a period of five years from the date of the contract. This contract was performed by the railway company until the

taking effect of the act of Congress under date of June 29, 1906. By the provisions of this act, no carrier was permitted to issue and deliver passes. After the taking effect of the act, the railway company declined to further issue passes, and the plaintiff brought an action for the purpose of rescinding the contract and for damages. Both the rescission and the claim for damages were denied, because the contract and conveyance were made subject to the constitutional power of Congress to regulate commerce. It was there said:

"The plaintiff conveyed the property to the defendant upon the faith of defendant's promise to perform conditions which were then wholly lawful but which, after a substantial part performance, became unlawful without any contributing cause upon the part of either party. The full performance has not been arrested by any act or omission of the defendant, but by the Congress of the United States acting within its constitutional powers. It follows from what has been said, that the defendant cannot be mulcted in damages because of, and only because of, its observance of a law making further performance of the contract on its part impossible."

There is nothing in the public service commission law which prevents the commission from directing that a rate contract be terminated, even though such contract when made was valid, when the performance of the contract results in discriminatory rates. Section 34 of the act (Laws of 1911, p. 561), provides:

"Nothing in this act shall be construed to prevent any gas company, electrical company or water company from continuing to furnish its product or the use of its lines, equipment or service under any contract or contracts in force at the date this act takes effect, or upon the taking effect of any schedule or schedules of rates subsequently filed with the commission, as herein provided, at the rates fixed in such contract or contracts: Provided, That the commission shall have power, in its discretion, to direct by order that such contract or contracts shall be terminated by the company party thereto, and thereupon such contract or contracts shall be terminated by such company as and when directed by such

order:  Provided, further, that the commission shall have no power to order the termination of any contract relating to the furnishing of water for irrigation or irrigation and domestic use, where such contract is based upon a consideration passing at the time of the execution of such contract." Rem. 1915 Code, § 8626-34.

A careful reading of this section of the statute discloses that the act itself does not operate to terminate any contracts in force at the date of its taking effect, or upon the taking effect of any schedule of rates subsequently filed with the commission; but, by the first proviso, power is conferred upon the commission to direct that such contract or contracts shall be terminated by the company party thereto.  This construction is made more obvious when the second proviso is considered, which denies the commission the power to terminate contracts relating to the furnishing of water for certain purposes.  It follows, therefore, that when the statute took effect, it did not, *ipso facto*, terminate the contract involved in this action which had previously been entered into, but it conferred power upon the commission to direct the termination of this and other like contracts.

The case of *State ex rel. Raymond Light & Water Co. v. Public Service Commission*, 83 Wash. 130, 145 Pac. 215, is relied upon to support the judgment of the trial court in this case.  There, the mill companies had previously owned title to the water and conveyed it to the water company with a reservation, and by reason of the reservation, were to be given free water for a period of forty-nine years.  In other words, when the mill companies conveyed the water to the water company, they did not convey the entire title.  A portion of the title they retained.  The contract was not subject to be terminated under the provisions of the public service commission law without compensation; the reason being, that the title of the mill companies to the water which had been reserved was not subject to be divested except by proper legal proceeding.  Here the mill company had no title to

the water.   It had a contract only by which it was to receive water at the specified rate.   This contract, as already shown, covering a matter within the police power, must be taken to have been made in view of the continuing power of the state to control rates; and when such power is exercised, the contract is no longer valid as against the act of the legislature.

It may be that there is some language in the opinion of the case just referred to, when disassociated from the facts in that case, that would seem to be broad enough to include the contract here involved.   But the decision in that case must be read in the light of the facts then before the court. It was not the intention to there hold that private individuals could, by virtue of their contracts, withdraw from the state the right to subsequently exercise its police power.   To so hold would be to say that the sovereign right of the state may be limited by private contract.   Had the legislature expressly authorized a contract for rates which were reasonable, and for a limited time, and the contract had been made in pursuance of such authorization, a different question would be presented, upon which no opinion is here expressed, because that question is not involved in this case.

If the distinction suggested between this and the case of *State ex rel. Raymond Light & Water Co. v. Public Service Commission* is not sound, then that case was not rightly decided, and we would be disinclined to give it controlling effect here.   So far as we are informed, there is no reported decision by any court which would sustain the doctrine that the right of the state to exercise its sovereign power, such as the police power, can be limited by private contract.   Such a doctrine would make the exercise of the police power on the part of the state subject to the contracts of individuals if such contracts had been entered into prior to the exercise of the power by the state.

The case of *Sultan R. & Timber Co. v. Great Northern R. Co.*, 58 Wash. 604, 109 Pac. 320, 1020, is distinguishable. There, a contract rate for the shipment of logs had been

made prior to the taking effect of the railroad commission law. The law, by its terms, did not make the contract void. There was no finding there by the commission, or by the court, that the rate fixed in the contract was in any manner discriminatory. The commission did not direct its termination. Here, the commission found that the contract resulted in discriminatory rates, and directed its cancellation. In one case the contract resulted in a discrimination of rates. In the other it did not. And therein lies the distinction.

In the respondent's brief, it is asserted that the public service commission was without power to terminate the contract here involved without first giving notice and an opportunity for a hearing on the part of the lumber company; and that a termination of the contract by the commission without notice or a hearing would not be in harmony with the due process of law clause of the Federal constitution. This position, however, overlooks the fact that the commission did not terminate the contract; but, as authorized under § 34 of the statute (Id., § 8626-34) ordered that the water company should terminate it. In obedience to this order, that company might have proceeded in one of two ways, either by bringing an action against the lumber company seeking the cancellation of the contract, or by serving notice that water would no longer be furnished under the contract rate, but would be charged for at the tariff rate. The water company pursued the latter course. The lumber company then had a right, which it exercised, to bring an action for the purpose of testing the validity of the contract. In this action, issues were framed and the cause was tried and a full hearing afforded. This is due process. The commission was not required, when it appeared, during its investigation as to the rates being charged by the water company and the services being rendered by it, that that company was furnishing water under contract which resulted in discrimination, to give notice to the holder of the contract before it could direct the water company to charge all consumers at the tariff

rate. There is no provision in the law requiring such notice. The provision of the statute quoted in the respondent's brief, § 80 (Id., § 8626-80) relates to the notice to be given to a public service corporation when a complaint is filed against it with the public service commission, and that it be given an opportunity to be heard upon its rates and service.

Another contention made by the respondent is that the complaint to the public service commission was not sufficiently broad to justify the order to the water company directing it to terminate the contract. The complaint charged unreasonable and excessive rates and inadequate and insufficient service. The water company, by its answer, alleged that, under existing rates, its returns were insufficient to justify a more adequate service. During the course of the investigation upon the subject, as already stated, the contract by which the mill company was receiving water at less than the tariff rate was disclosed. Had it not been for this contract, the receipts of the company would have been substantially larger and would have afforded it an opportunity to render a more adequate service. When it appeared during the hearing that a contract was outstanding which resulted in a discrimination of rates, the commission was then authorized to direct the water company to charge all consumers at its tariff rate, and further, to direct it to terminate the contract or contracts which resulted in discrimination.

The judgment will be reversed, and the cause remanded with direction to the superior court to dismiss the action.

MORRIS, C. J., MOUNT, PARKER, BAUSMAN, CHADWICK, ELLIS, and FULLERTON, JJ., concur.