ARKANSAS NATURAL GAS 'COMPANY *v.* NORTON COMPANY.

Opinion delivered June 23, 1924.

1. GAS—CORPORATION HELD TO BE PUBLIC UTILITY.—Where a corporation authorized to produce, transport and sell natural gas exercised the rights and privileges of a public utility, and filed a schedule of rates, and subjected itself to control by State authorities, it constituted itself a public utility for the purpose of furnishing natural gas, and was subject to statutory regulations.

2. GAS—PUBLIC UTILITY.—A corporation supplying natural gas to customers cannot be considered as a public utility with respect to certain classes of consumers and a private corporation as to certain others.

3. GAS—PUBLIC UTILITY—DISTINCTION BETWEEN CONSUMERS.—While a corporation supplying gas to consumers cannot arbitrarily discriminate among consumers similarly situated, a distinction may be made between different consumers or classes of consumers on account of location, amount of consumption, or such other material conditions which distinguish them from each other or from other classes.

4. GAS—POWER OF CORPORATION COMMISSION TO FIX RATES.—It was beyond the power of a natural gas company, operating as a public utility, to contract with respect to furnishing gas so as to interfere with the power of the Corporation Commission to regulate rates for gas furnished.

5. GAS—POWER OF GAS COMPANY TO ENFORCE RATE-FIXING CONTRACTS.—Where a natural gas company subjected itself to the control of the Corporation Commission, under Crawford & Moses' Dig., §§ 1653-1656, and was granted an indeterminate permit to surrender its franchise and be released from its contracts, and failed to apply for reinstatement of such contracts, as provided by Gen. Acts 1921, p. 177, creating the Railroad Commission in lieu of the Corporation Commission, it lost its power to enforce the rates provided in such contracts.

6. GAS—POWER TO ENFORCE RATE-FIXING CONTRACTS—CONSTRUCTION OF STATUTE.—Gen. Acts 1921, p. 177, creating the Railroad Commission, providing by § 22, as amended by *Id.* p. 429, § 1, that such Commission shall have no power to modify or impair any existing contract for supplying gas, meant that the validity of any such contracts shall not be impaired, and does not intend to give to such contracts any validity or continuing force which they did not have at the time the act was passed, and power to enforce rate-fixing contracts previously released was not preserved to the gas company by such act.

7. GAS—PAYMENT BY CONSUMER HELD INVOLUNTARY.—Where a public utility threatened to shut off the supply of gas if a consumer did not pay the increased rate without protest, money paid under such circumstances, though without protest, was not paid voluntarily.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

*Rose, Hemingway, Cantrell & Loughborough,* for appellees.

The gas company was acting as a public utility in its service to the industrial consumers of the gas it supplied, and, as such, had no right to charge more than the rates established by the rate-fixing bodies of the State. Any contract or agreement the gas company might make with a consumer, whereby it charged higher than the established rates, was void. As to whether or not the gas company was acting as a public utility, see *Clear Creek Oil & Gas Company* v. *Fort Smith Spelter Company,* 148 Ark. 260, and the clear test set forth at page 273. The Dally letter of November 24, 1920, which set forth the terms on which the gas company would abstain from cutting off the gas of the Bauxite company in trying to enforce a higher rate than that permitted by law, would, as stated above, be void and without any contractual force. Act 571, Acts 1919, §§ 7, 8, 30; 149 Ark. 502, 507; 161 Ark. 549; 100 Ark. 22. The agreement to pay the 45c rate was clearly only to do so until appellant had made the application to the Corporation Commission then contemplated, and that application has been disposed of. There can be no doubt that, when Mr. Dally made his agreement with Mr. Murray, embodied in the

letter from Mr. Dally to Mr. Neilson, dated November 24, 1920, he had in mind that the gas company would only charge the 45c rate until the Commission passed on the application of the gas company for a higher rate, and that, if this application was denied by the Commission, or a lower rate put in force, refund would immediately be made to the Bauxite company.

*Moore, Smith, Moore & Trieber,* for appellant.

1.  The parties understood by the contract entered into between the gas company and the Bauxite company in September, 1920, as evidenced by letter of A. B. Dally, Jr., a vice-president of the gas company, to W. C. Neilson, president of the Bauxite company, under date of November 24, 1920, that the refund was to be based on the rate as finally established, if a lower rate than the 45c rate was put into effect, as is shown by Mr. Neilson's telegram to the gas company, dated December 11, 1920, which withdrew the interpretative clause in his letter of November 30, 1920, and his effort to amend the contract in his letters of December 7 and 9, 1920, and this view is supported by the finding of the chancellor that the refund was to be based on the rate as "ultimately established." The persuasive effect of this finding of the chancellor will not be overturned if it is consistent with a reasonable interpretation of the evidence of the respective parties.

2.  The Arkansas Railroad Commission was prohibited by the terms of act 443, Acts 1921, approved March 25, 1921, amending act 124, Acts 1921, approved February 15, 1921, from modifying or impairing the obligation of the contract entered into between the gas company and the Bauxite company in the fall of 1920, prescribing the rate for the supply of gas to the Bauxite company, and the conditions upon which a refund would be made, if a lower rate was ultimately established for the bauxite district.   261 U. S. 379.

3.  The conditions of service to the Bauxite and Norton companies are so dissimilar from the conditions affecting other industrial users as to permit the gas

company to charge them a higher rate than the rates charged other industrials, and to make private term contracts with them not affected by the general rates prescribed the ordinary industrial user. The gas company has the right to make private contracts for the supply of industrial gas, based on competitive price of other fuels, and the cost to the particular consumer of the use of gas as a fuel unaffected by Commission regulation.

HART, J. Separate suits were brought by the Norton Company and the American Bauxite Company against the Arkansas Natural Gas Company in the chancery court to recover overcharges for gas furnished by the defendant, and also to enjoin the defendant from cutting off the supply of gas of the plaintiff. The cases involve in the main the same issues, and were consolidated for the purpose of trial.

The Norton Company is a corporation engaged in the business of manufacturing grinding wheels, and has a plant at Bauxite, in Saline County, Arkansas, for the drying of bauxite, which it uses in its business.

The American Bauxite Company is a corporation engaged in crushing and drying bauxite at its plant at Bauxite in Saline County, Arkansas. Both corporations use gas and other fuel in the conduct of their business. The Arkansas Natural Gas Company is a public utility engaged in the business of supplying natural gas to consumers in certain cities, towns and villages and the territory adjacent thereto in the State of Arkansas.

The Norton Company and the American Bauxite Company were consumers of natural gas furnished at their manufacturing plants by the Arkansas Natural Gas Company. On October 28, 1920, the Norton Company brought suit in equity against the Arkansas Natural Gas Company to enjoin it from shutting off its supply of gas for the reason that the plaintiff would not pay the increased price for gas, which it claimed was unreasonable.

On the 2d day of May, 1922, the American Bauxite Company brought suit in the same chancery court against

the Arkansas Natural Gas Company to restrain it from cutting off its supply of gas and for the recovery of the amount of overcharge which the defendant had illegally exacted from the plaintiff.

A separate decree was rendered in favor of each plaintiff against the defendant on January 24, 1923. By consent of all parties, an order was made consolidating the cases, not only for the purpose of trial in the chancery court, but for the purpose of appealing to this court.

The Arkansas Natural Gas Company has perfected an appeal to this court from the decree against it in each of said cases.

It is earnestly insisted by counsel for the defendant that its business of supplying natural gas to users for industrial and manufacturing purposes is a private business, and that in this respect it is not subject to the regulation of its rates as a public utility.

We cannot agree with counsel in this contention. The Arkansas Natural Gas Company is a corporation organized under the laws of the State of Delaware. Its charter authorizes it to prospect for and produce petroleum and natural gas, to transport the same by pipe lines, and market and sell the same. Its charter further authorizes it to lay, maintain, and operate pipe lines for the carriage of natural gas, and to purchase or otherwise acquire natural gas and to transport and pipe the same by means of pipe lines, etc., and to market and sell the same.

The Arkansas Pipe Line Company was organized under the laws of the State of Arkansas. Its charter authorized it to produce and market mineral oils and natural gas for heat, light and power by means of pipe lines from without the State to points within the State, or between points wholly within the State, with all the rights incident thereto, including the right to construct and operate telephone and telegraph lines. This company crossed public roads with its pipe lines whenever necessary, and applied to various county courts for permission

to do so. In one instance it filed a condemnation suit and made a deposit, as in other condemnation cases. It purchased right-of-way for its pipe lines from railroad companies and from private individuals and corporations. It laid its pipe lines from a point in the State of Louisiana in a northerly direction to the city of Little Rock, in the State of Arkansas, and, in laying its pipe lines, crossed numerous public roads and the right-of-way of several railroads.

The Arkansas Natural Gas Company took over all the property of the Arkansas Pipe Line Company, together with all the rights it had acquired under the exercise of the power of eminent domain, or the right to exercise that power under the statutes, as a corporation organized under the laws of the State for the purpose of producing natural gas and transporting or conveying it to market by and through pipe lines.

The Arkansas Natural Gas Company also commenced to exercise all the rights and privileges of a public utility, and filed a schedule of rates, and otherwise subjected itself to the regulation and control exercised over public utilities by the duly constituted authorities of the State of Arkansas. By doing these acts the defendant constituted itself a public utility for the purpose of furnishing natural gas to domestic and industrial consumers, and is subject to all the regulations prescribed by statute for utilities of this sort. We think this clear from the principles of law decided in *Clear Creek Oil & Gas Co.* v. *Fort Smith Spelter Co.*, 148 Ark. 260, and 161 Ark. 12.

Counsel for appellant concedes that the Arkansas Natural Gas Company is a public utility, so far as supplying natural gas to domestic and industrial consumers in the city of Little Rock is concerned, but claims that it is not such public utility with reference to the Norton Company and to the American Bauxite Company, which are situated outside of the city of Little Rock, and which, it is claimed, on account of their peculiar location and of the large amount of gas they use, are not susceptible of being classified.

Now, a corporation supplying natural gas to consumers cannot be considered as a public utility with respect to certain classes of its consumers and as a private corporation with regard to certain others. The acceptance by the Arkansas Natural Gas Company of the franchise and privileges granted it carried with it the duty of supplying all persons and corporations along the lines of its main with natural gas, without discrimination. All are entitled to have the same service on equal terms and at a uniform rate. The law will not tolerate a discrimination in the charges of public utility corporations. If this were not so, and if corporations existing by grant of public franchises, in supplying water, gas, electric lights and the like, could favor certain individuals or corporations with low rates and charge others higher rates for the same service, the business interests and domestic comforts of every one would be at their mercy.

In this connection it may be stated that, while public service corporations cannot act arbitrarily, or discriminate among their consumers similarly situated by way of favoring one consumer or class of consumers over others, a distinction may be made between different consumers or classes of consumers on account of location, amount of consumption, or such other material conditions which distinguish them from each other or from other classes. *Yancey* v. *Batesville Telephone Co.,* 81 Ark. 486; *Southwestern Telegraph & Telephone Co.* v. *Sharp & White,* 118 Ark. 541, and Pond on Public Utilities, § 213, p. 262.

It is next contended by counsel for defendant that to allow plaintiffs to recover overcharges for gas furnished them would impair the obligation of the contract entered into between each of the plaintiffs and the defendant for furnishing gas for use at their manufacturing plants.

We cannot agree with counsel in this contention. It is true that the Arkansas Natural Gas Company made a separate contract with the Norton Company and with the American Bauxite Company to furnish natural gas

for use at the manufacturing plant of each company; but the Arkansas Natural Gas Company was operating as a public utility, and it was beyond its power to contract with respect to gas so far as such contract might interfere with the power of the Corporation Commission to regulate rates for gas furnished. *Harrison Elec. Co.* v. *Citizens' Ice & Storage Co.,* 149 Ark. 502, and *Chambliss* v. *Clear Creek Oil & Gas Co.,* 161 Ark. 549.

It appears from the record that the Arkansas Natural Gas Company filed its schedule of rates with the Arkansas Corporation Commission, which was created by virtue of an act of the Legislature of 1919. In various other ways it also subjected itself to the control of the Arkansas Corporation Commission and exercised powers and privileges granted to public utility companies under the act creating the Corporation Commission. The act in question provided for what is called indeterminate permits to certain public utilities. Crawford & Moses' Digest, §§ 1653-1656 inclusive.

The latter section in particular provides that any public utility operating under an existing license, permit, or franchise shall, upon filing with the Corporation Commission a written declaration that it surrenders such license, permit or franchise, receive, by operation of law, an indeterminate permit as provided by the act, and that such public utility shall hold such permit under all the terms, conditions and limitations of the act.

The section further provides that the filing of such declaration shall be deemed a waiver by such utility of the right to insist upon the fulfillment of any contract entered into relating to any rate, charge or service regulated by the act.

By an act of the Legislature approved February 15, 1921, the Arkansas Corporation Commission was abolished, and the Arkansas Railroad Commission created in lieu thereof. General Acts of 1921, p. 177.

Section 15 of this act provides, in effect, that contracts, franchises, and leases may be restored to utilities

operating under indeterminate permits, upon application made by such public utility corporation in the manner provided in the act.

The section provides that the franchise and contracts of such corporation may be reinstated upon proper application under the same conditions as existed at the time said indeterminate permit was granted by the Arkansas Corporation Commission. The act further provides that, unless the application for reinstatement of its franchise and contracts is made within the time and in the manner provided by the act, such right shall be deemed waived by such public utility.

No application was made for the reinstatement of contracts by the Arkansas Natural Gas Company. It is contended, however, that all existing contracts were expressly exempted from the operation of the act creating the Arkansas Railroad Commission and giving it power to fix and regulate the rates of public utilities, including those furnishing natural gas for domestic and industrial use, by the section of the act amending the act creating the Arkansas Railroad Commission, approved March 25, 1921. See General Acts of 1921, p. 429.

The purpose of this act was to transfer to the Arkansas Railroad Commission the records under the control of the Arkansas Corporation Commission and to give it power to continue the hearings in regard to gas rates in certain cases, and to determine the same.

The section contains a proviso that the Arkansas Railroad Commission shall have no jurisdiction or power to modify or impair any existing contract for supplying gas to persons, firms, corporations, or municipalities or distributing companies, and that such contracts shall not be affected by the act, or the act of which it is an amendment.

It is contended that this section preserves to the Arkansas Natural Gas Company all existing contracts in force at the time of the passage of the act. We do

not think so. The act simply means that the validity of any contract shall not be impaired, and does not intend to give such contract any validity or continuing force which it did not have at the time of the passage of the act. This is shown by the concluding part of the proviso, to the effect that such contracts shall not be affected by this act or the act of which it is an amendment. As we have already seen, there can be no valid contract regulating rates as against the power of public control by the Corporation Commission. The public utility accepts the franchise and privileges granted it, subject to existing laws.

This is not a case like *Pocahontas* v. *Central Power & Light Co.*, 152 Ark. 276, where a municipal corporation was expressly authorized by the Legislature to grant a franchise to a public service corporation in order to procure it to enter the municipality, and to furnish electricity and gas to consumers upon terms and conditions accepted by the corporation.

Here the franchise and privileges granted to the Arkansas Natural Gas Company were not accepted by it upon any such terms, conditions or restrictions. It applied for and accepted a franchise subject to the existing laws of the State, and, upon its own motion, applied for and accepted what is called an indeterminate permit to surrender its franchise and be released from its contracts, and did not, under the amended act, apply for a reinstatement of its franchise and contracts.

As we have already seen, it has a practical monopoly of the business of furnishing natural gas within the limits of the territory described in its franchise, and it is its duty to furnish all consumers with gas upon the same terms, with the proviso above stated, that it may make a reasonable classification of its consumers. It cannot, however, fix different prices and impose different terms upon its consumers, either domestic or industrial, according to its own will. It is bound to furnish gas at a reasonable rate to every consumer and without unjust

discrimination, subject to the proper classification of its consumers as above indicated.

The defendant, also seeks to reverse the decree against it in favor of the American Bauxite Company on the ground that the payments made by it were voluntary, and on that account cannot be recovered.

We do not think this contention is well taken. Some time between the middle of August and September, 1920, the purchasing agent of the American Bauxite Company first ascertained that his company was being charged a different rate from that charged other industries similarly situated. The defendant contended that it was entitled to receive the rate charged on account of the peculiar conditions relating to its service to the American Bauxite Company. It already had a written contract with the American Bauxite Company for furnishing gas to it. As we have already seen, notwithstanding this contract, the rates charged were subject to change appropriate to changed conditions relative to the service. At any event, in September, 1920, the defendant deemed that conditions had changed, and applied to the Arkansas Corporation Commission for the right to establish an increased rate to industrial consumers, including the American Bauxite Company.

It will be remembered that, at this time, the Arkansas Corporation Commission was authorized to establish rates for public utilities of this kind. When the matter was finally disposed of, the Arkansas Railroad Commission had succeeded to the powers of the Arkansas Corporation Commission, and established the rates which are the basis of the recovery in these cases.

The American Bauxite Company contested the right of the Arkansas Natural Gas Company to raise the rates, and, after some correspondence between the two corporations, the American Bauxite Company proposed to pay the increased rate under a protest incorporated in a clause of one of its letters to that effect to the defendant. In other words, the letter expressly made a tender of the

increased rates asked by defendant, subject to the American Bauxite Company not waiving its right to recover whatever excess payment it might make over the rates finally established by the Corporation Commission. The defendant refused to deal with it on these terms, and continually threatened to shut off the supply of gas if the American Bauxite Company did not pay the increased rates without protest, and so stated in a letter to it. Under the threat of its service not being continued, the American Bauxite Company finally made the payments demanded, and struck out from its letter, which was contractual in its nature, the clause to the effect that it was making the payments under protest.

The representatives of the American Bauxite Company claim that they did so because, if the gas supply of that company had been discontinued at that time, such action would have resulted in great and irreparable loss to the company. They stated in detail the conditions which would cause such a loss, but they need not be repeated here.

There is what is called moral duress, or business compulsion, which, when exercised, prevents overcharges, although not made under protest, from being voluntary payments, and therefore not recoverable.

As we have already seen, under modern business conditions, public utilities are a necessity, and have a practical monopoly in the fields occupied by them, respectively, in the business world. Their products must be accepted and used, not only for domestic convenience, but on account of business necessities. Take the case of supplying gas, for instance. The public service corporation furnishing it has the right, by purchase and by eminent domain proceedings, to secure a right-of-way over and across the lands of private individuals, the public roads, railroad right-of-way, and the streets of cities and towns. They also have a right to establish rates which are equivalent to the service performed by them. Thus they acquire a great advantage over their

business rivals, and are thereby enabled to furnish gas to consumers at a much cheaper rate and under much more favorable conditions. The manufacturer needing and using gas in his business must purchase it from the public service corporation, or his business competitors, who have such service, will have a great advantage over him. If a manufacturer or other business enterprise cannot secure the service upon the same terms and under the same conditions as his rivals in business, he will suffer serious loss or damage to his business, and in some cases his business will be entirely destroyed. If the public service corporation is allowed to act in an arbitrary and discriminatory manner in performing its service to the public, it can, in all cases, seriously injure any of its customers, or destroy his business entirely. The prosperity of the business man using the product of the public service corporation would depend upon the favors shown him by that corporation, or upon the mere whim or caprice of its agents. In such cases the parties do not stand on an equal footing. Delay or resort to law would be a matter of indifference to the public service corporation, but it might cause irreparable injury to the consumer. It is extortion to press the payment of illegal or unjust demands by such means. As a reasonable regulation, a public service corporation may cut off the supply of gas or other product furnished by it where its consumers fail or refuse to pay the proper charges. The public service corporation, however, has no power to establish excessive or unreasonable rates for its service, and to allow it to exercise the power of cutting off the supply of its product for the nonpayment of extortionate or excessive demands would be to give it the power to cripple business enterprises at will, and for no valid reason. Such action is generally held to be duress in law.

The rule is of universal application with reference to public carriers of freight, so far as we have ascertained. Hutchinson on Carriers, 3rd ed. §§ 521 and 1341; 30 Cyc.

p. 1303; *Mobile & Montgomery Ry. Co.* v. *Steiner, McGehee & Co.,* 61 Ala. 559; *Chicago & Alton Rd. Co.* v. *Chicago, Vermillion and Washington Coal Co.,* 79 Ill. 121; *Peters* v. *Railroad Co.* (Ohio), 51 Am. St. Rep. 814; *Clough* v. *Boston, etc., R. Co.* (N. H.) Ann. Cas. 1915B, p. 1195; *Lehigh Coal & Navigation Co.* v. *Brown,* 100 Penn. St. 338; *Louisville, Evansville & St. Louis Rd. Co.* v. *Wilson* (Ind.), 18 L. R. A. 105; *California Adjustment Co.* v. *Atchison, T. & S. F. Ry. Co.* (Cal.), 175 Pac. 682; and *Beckwith* v. *Frisbie & Sons,* 32 Vt. 559.

The rule stated, for like reasons, applies to other public service corporations, and the tendency in the later decisions is to extend the doctrine in favor of those making payments of illegal charges or exactions under apprehension that their business will be stopped or seriously injured if the money is not paid.    *American Brewing Co.* v. *St. Louis* (Mo.), 2 Ann. Cas. 821; *Westlake & Button* v. *St. Louis,* 77 Mo. 47; *Indiana Natural & Illuminating Gas Co.* v. *Anthony* (Ind.), 58 N. E. 869; *Chicago* v. *Northwestern Mutual Life Ins. Co.* (Ill.), 1 L. R. A. (N. S.) 770; *St. Louis Brewing Assn.* v. *St. Louis* (Mo.), 37 S. W. 525; and *New Orleans & N. E. Rd. Co.* v. *Louisiana Construction & Imp. Co.,* (La.), 94 Am. St. Rep. 395, and case note.

Woodward on the Law of Quasi-Contracts, in § 220, says that, because common carriers and some other public service corporations usually enjoy an advantage of position not unlike that of public officers, illegal freights, tolls, or other charges exacted by such corporations may be recovered as money paid under compulsion.

In Keener on Quasi-Contracts, at page 437, it is said that money paid to one who, because of his position, is under an obligation to discharge certain duties to the public, but who refused to discharge such duties without the payment of a sum of money to which he is not entitled, can be recovered as money paid under compulsion.

Upon the circumstances of this case we are of the opinion that the payments were not voluntary. They were made in order to induce the Arkansas Natural Gas Company to do that which it was bound to do without them. To protest would be an idle ceremony. The law looks to the substance of things, and does not require useless forms. The public service corporation and the consumer were in no sense on equal terms, and the money thus paid to obtain the necessary service was not voluntarily paid, as the law interprets that phrase.

The briefs are very voluminous, but there seems to be no contention about the amount of gas furnished or the amount due under the rates finally established by the Arkansas Railroad Commission. The main contention is the right of the consumers to recover the excess charges made by the public service corporation.

The decree in the chancery court was made in conformity with the principles of law announced above, and it is therefore affirmed.