PARAGOULD *v*. ARKANSAS LIGHT & POWER COMPANY.

Opinion delivered May 10, 1926.

1. DAMAGES—BREACH OF CONTRACT—BURDEN OF PROOF.—In an action to recover damages for breach of a contract, the burden is on the plaintiff to establish such damages; but where the defendant claims that plaintiff could and should have minimized the damages so found, the burden is on the defendant to prove such fact.

2. DAMAGES—BREACH OF CONTRACT—DUTY TO MINIMIZE DAMAGES.— Where a party who has breached his contract subsequently offers a new contract, the other party is not required to accept such offer in order to minimize his damages, if the offer is conditioned upon a cancellation, extinguishment or rescission of the claim for damages for breach of the original contract.

3. DAMAGES—BREACH OF CONTRACT—DUTY TO MINIMIZE DAMAGES.— In a suit by a city to recover damages caused by defendant light company's breach of its contract to furnish power at agreed rate to do the pumping for the city's waterworks, defendant cannot maintain that the city should have minimized the damages by using defendant's power at its primary rate where to do so would have required large additional expense by the city and where there was no established rate of which the city had the right, independently of contract, to avail itself.

4. DAMAGES—BREACH OF CONTRACT.—Where the authority of a city to maintain its waterworks plant ceased upon the creation by the Legislature of a waterworks district to take over such plant and the acceptance thereof by the city, the city could not claim subsequent damages for breach of a contract to furnish power for such waterworks.

Appeal from Greene Circuit Court; *G. E. Keck,* Judge; modified.

*Block & Kirsch,* for appellant.

*Robt. E. Fuhr* and *Robinson, House & Moses,* for appellee.

SMITH, J. This is the second appeal in this case. The opinion on the former appeal is found reported in 146 Ark. 1. On the former appeal it was decided that the Arkansas Light & Power Company, hereinafter referred to as the company, had contracted with the city of Paragould, hereinafter referred to as the city, to furnish electrical power to do the pumping for the city's waterworks plant for a period of ten years, and that the company had breached its contract and was liable to the city for the damages resulting from this breach. The cause was remanded on the former appeal for the assessment of the damages.

By the terms of the contract the company agreed to furnish power for a period of ten years at the rates fixed in the contract, which were not in any event to exceed forty per cent. of the bills collected by the city from its consumers, at the rate to the consumers then in effect.

The performance of the contract was begun on February 7, 1917, and continued until July 24, 1918, at which time the company gave notice that, after thirty days, it would discontinue furnishing the city power at the contract rates, and, pursuant to this notice, the company discontinued its service on August 25, 1918, after which time the city resumed the use of the steam power plant with which it had done the pumping prior to the time its contract with the company became effective, and this suit was commenced to recover damages for the breach of the contract.

There existed in the city two waterworks improvement districts, known as Districts Nos. 1 and 2, and the city had, pursuant to the provisions of § 5739, C. & M. Digest, taken over and was operating the steam pumping plant when its contract with the company was made.

During the pendency of the litigation, and before the decision of this court on the first appeal, there was passed at the extra session of the General Assembly on February 26, 1920, an act numbered 397, "providing for the formation of an improvement district in the city of Paragould for the purpose of repairing, extending, enlarging, reconstructing, rebuilding and taking over the waterworks system in said city, and providing for additional sources of water supply for the demands of the city."

Pursuant to the power conferred in this special act, Waterworks Improvement District No. 3 was organized. This new district included all the territory embraced in Districts Nos. 1 and 2, and included the entire city, which was an area considerably larger than the original Districts Nos. 1 and 2.

By this special act, District No. 3 superseded Districts Nos. 1 and 2, and the new district took over the waterworks system of the old districts, and it was provided that the commissioners of the new district should enlarge and reconstruct the existing districts, and should remain in control thereof and operate the same until all the debts of both the old and the new districts had been paid, after which the control of the system should pass to the city.

The initial ordinance of the city council to make the special act of the General Assembly effective was passed on May 19, 1920, and the final ordinance creating the district and appointing the commissioners was enacted by the city council on July 23, 1920, and the commissioners of the new district qualified thereunder. After the organization of District No. 3 and the qualification of its commissioners, it was moved in the court below that the new district be made a party plaintiff to the action, by reason of its relationship to Districts Nos. 1 and 2, but this motion was overruled, and the trial proceeded between the original parties.

The company admits that, under the decisions of this court on the former appeal, it is liable to the city for the damages occasioned by the breach of its contract, but it

insists that the city could and should have minimized its damages by using its power at what it calls its primary rate, and that its liability for the breach of the contract could not extend beyond the time when Improvement District No. 3 was organized. On the other hand, the city contends that it is entitled to recover, as the measure of its damages, the difference between the contract price for the necessary power and the actual costs incurred by it in generating this power, and that it is entitled to recover the total of this difference up to the time of the expiration of the contract between the city and the company.

The cause was submitted to the court without a jury, and the court found that the city was bound by the so-called primary rate, and that the city's right to recover ceased with the creation of Waterworks Improvement District No. 3, and a judgment was rendered in accordance with these findings, from which the city has appealed. In order that a final judgment might be rendered upon this appeal, the court further found the damages sustained by the city in the operation of its plant in excess of the contract price, first, to the time of the organization of Waterworks Improvement District No. 3, and second, to the time of the institution of this suit. The correctness of these findings is not questioned by the company, its insistence being that the findings upon which the court based its judgment are correct and that the judgment should be affirmed.

There is, first, much discussion as to the burden of proof, each insisting that this burden rests upon the other. But we are of opinion that, it having been adjudged that the company had breached the contract and was liable for the damages resulting therefrom, the burden of proof was upon the city to establish its damages, but, in so far as it was contended that the damages thus shown might and should have been minimized, that burden was upon the company. The law is so declared in the annotated cases cited in the note to § 197 of the chapter on Damages in 8 R. C. L., page 655, and in the text to the section cited it is stated that "where it is claimed that expenditures were

unreasonably incurred (in performing the service which the defaulting party should have performed), the burden is on the defendant to prove such to be the fact." *Arkansas Short Leaf Lbr. Co.* v. *McInturf,* 134 Ark. 284.

It is very earnestly insisted by the company that the city should not have continued to use the plant which it had in use when the contract was made with the company to furnish the necessary power, but that the city should have used the power which the company was prepared to furnish, and would have furnished, at what it calls its primary rate.

The city's plant was equipped to burn coal, and it was shown that the price of coal advanced constantly from the time the original contract between the city and the company was made until 1920, when the price of coal began to decline. The testimony shows that the company operated in a number of cities and towns of the State, and that it had established a rate available to all consumers of its power using the company's 2300 3-phase service. The service in the city of Paragould was a 2-phase service until the spring of 1921, and there is a question whether this service is interchangeable, but, conceding that it is, we do not regard that fact as controlling here, for reasons which will be hereinafter discussed.

It is an admitted fact that the city could not have availed itself of the company's primary rate without changing from a steam to an electrical plant, and to do this additional machinery would have been required, which would have cost $6,000. The court found that the city should have purchased this machinery, in order that it might avail itself of the company's primary rate, and assessed the cost of this machinery as a part of the damages which the city should recover.

We are of opinion, however, that the city was not required to incur this expense in order that its damages might be minimized. After the company had breached the contract, various propositions were made and negotiations conducted looking to an adjustment of the differences growing out of the company's default, and we

think it quite clear that the company's attitude in these negotiations was that of a party having the right to contract as to the rates to be charged, rather than that of a public utility company which was required to furnish service at a fixed price to any one desiring it. This primary rate had never been approved by or filed with any governmental agency having authority to fix or to regulate rates. Indeed, long after the controversy had arisen, the president of the company, in offering to furnish the power which its original contract required it to furnish, coupled to this offer the condition that the acceptance thereof should be in full settlement of the city's claim for damages which had then accrued as a result of the company's breach of the contract. This offer is contained in a letter dated January 18, 1919, addressed to the city council, and the first paragraph thereof reads as follows: "In behalf of the Arkansas Light & Power Company, we beg to submit the following proposition in full settlement of the controversy now pending between said company and the city of Paragould, to wit:" It will be remembered that nearly five months had then expired since the date of the company's default.

It is, of course, the law that the company could not impose a condition that the city waive any valid claim for damages, even though the company did in fact have a rate not dependent upon contract. The excellent brief filed on behalf of the company concedes this to be the law. We copy from this brief the following statement of the law, which is fully sustained by the authorities: "As a general proposition of law, it is true that any offer made by a party who has breached his contract toward performing the contract which was breached, or entering into a new contract, need not be accepted by the other party in order to minimize damages, if that offer results in a cancellation, extinguishment or rescission of the claim for damages for the breach of the original contract. But if the offer as made does not result in the waiver of the breach of contract, and the other party is still in the same position

to recover on said breach of contract, this rule does not apply.''

We do not copy the letter from the president of appellee company to the city council in full, but it may be said that it contains no reference to any primary rate available to all persons. The letter is a proposition to make a private contract, and, while the contract proposed is similar to what the company shows its primary rate was, it is pointed out that there is a material difference in the discounts for excess of power used between the rates offered in this letter and those allowed in the primary rates.

It is insisted by counsel for the company that, in February, 1919, shortly after the above letter was written, the manager of the company in Paragould made the city a definite proposition for furnishing power for its water plant, which proposition was based on the primary rate and which did not include any condition or requirement that the acceptance of same should constitute a waiver of damages for the breach of the contract. This witness did testify that he made the city a proposition "based on the primary power rate, along the same line." But the manager's offer contained no reference to the alleged primary rate and was dependent upon the price of coal, and it is conceded that the discounts contemplated in his proposition were not identical with those called for in the primary rate. In other words, we think the manager's proposition was nothing more nor less than an offer to make a new contract.

That there was no established rate which the city had the right, independently of contract, to avail itself of, and which the company must have furnished, independently of any contract so to do, is conclusively shown by the fact that, after breaching the contract, the company, on October 1, 1918, of its own motion and without permission so to do from any one, raised its primary rate. So that if, when the contract was breached, the city had applied for service under the then existing primary rate, and had obtained it, after incurring the expense of $6,000 to install

the machinery necessary to make the company's service available, it would have found its rate increased, with no assurance that it would not be raised still higher as the price of coal continued to advance.

Counsel cite and review the cases which have been decided by this court since the passage of the act of April 1, 1919 (act 571, Acts 1919, p. 411), appearing as §§ 1607 et seq., C. & M. Digest.

The case of *Harrison Electric Light Co.* v. *Citizens' Ice & Storage Co.*, 149 Ark. 502, is cited. In that case the ice company had contracted with the public utility company for electric current at a fixed price per month. The utility company increased the charge after having filed with the Corporation Commission a schedule of its rates. The ice company brought suit to enjoin the utility company from cutting off its service when it refused to pay the new rate. It was held by this court on the appeal that, where a public utility filed a schedule of increased rates with the Corporation Commission, the new rates superseded contractual rates theretofore established, as there could be no valid contract against the power of public control by the Corporation Commission.

In the case of *Arkansas Natural Gas Co.* v. *Norton Co.*, 165 Ark. 172, the gas company had filed its schedule of rates with the Arkansas Corporation Commission, which was created by the act of 1919 above referred to, and the Norton Company demanded that it be furnished gas at these rates. The utility company refused to furnish gas in accordance with its scheduled rates, and the consumer paid the rate demanded to prevent the service being discontinued, and sued to recover the excess paid over the scheduled rates. It was held on the appeal to this court that the payment had not been made voluntarily, and might be recovered. In so holding we said that the law will not tolerate a discrimination in the charges of public utility corporations, and that all are entitled to have the same service on equal terms and at a uniform rate at the hands of corporations which have become public utility companies.

These cases are not in point, for the reason that the act of 1919 had not been passed when the company breached its contract, and it was not shown that the company filed with the Corporation Commission, after its creation, any schedule of its rates. Upon the contrary, its attitude throughout towards the city was that it would furnish power to the city only upon such conditions as it might agree by contract to do, and, if power were furnished in accordance with this so-called primary rate, this would be done as a matter of contract. Moreover, the original contract herein sued on fixed a price at which the power would be furnished to the city's plant under the conditions existing at the time the contract was made, and all the subsequent offers of service involved the expenditure by the city of $6,000 to obtain the service which the contract required the company to give without this expenditure. Had the city entered into one of the new contracts proposed, it too might have been breached had the price of coal continued to advance, or if, for any other reason, the company had elected not to perform.

We conclude therefore that there was no primary or permanent rate which the city could with certainty have availed itself of in an attempt to minimize its damages, and the city was therefore entitled to recover the increased cost of operating its plant with the facilities it had when the original contract was made.

But we think the right to recover this excess in cost did not extend beyond the time when Waterworks Improvement District No. 3 was organized. The city by its ordinance elected to proceed under the special act creating this district. The city was operating under the authority of § 5739, C. & M. Digest, when the original contract was made. This section gives to the city and town councils of the State, after the construction of waterworks or gas or electric light works has been completed and paid for by an improvement district, the power to take over and operate such works, and, as an incident to this power, to make necessary contracts in regard thereto. But, after Improvement District No.

3 had been organized, the control of the city ceased. Section 5739, C. & M. Digest, was no longer applicable to this contract, for the reason that the commissioners of that district were placed in charge of it under the ordinances enacted to make the special act of 1920 effective, and the commissioners were directed to operate the plant until the debts of both the old and the new districts had been paid. Moreover, District No. 3 was not the entity with which the company had contracted. It was a different and a larger district, and the city, as a contracting party having authority to operate, had passed out of existence. The doctrine of the case of *Harrison Electric Light Co.* v. *Citizens' Ice & Storage Co., supra,* is applicable here, for, as was there said, there can be no valid contract against the power of public control.

The court below found the fact to be that, from the date of the breach of the contract by the company to the date of the approval of the second petition by the property owners in Waterworks District No. 3, the city incurred expenses in excess of the contract price in the performance of the contract in the sum of $22,127.64, and that the interest thereon, computed on the basis of settlement provided for in the contract, amounted to $5,910.36, and, as the correctness of this finding is not questioned, judgment will be rendered here for the total of these two amounts.

Justices WOOD and HART dissent.

McCULLOCH, C. J. I concur in the judgment of reversal for the reason that the city is entitled to recover all that it is allowed under the opinion of the majority, and more. I discover no sound theory upon which the damages should be limited to such as accrued up to the organization of the new improvement district. The damages, and the right of action to recover same, accrued upon the breach of the contract, and there would seem to be no good reason why appellee should benefit by the change in the control of the public utility in the city or that the city should be held to have forfeited its right

to recover the damages because it relinquished control to another public agency. The city was the public agency in the control of the utility, and the change of control was merely from one agency to another—both being for the public. All damages recovered by the city inure to the benefit of the public, hence it is wholly immaterial that there has been a change to the agency which is in the future to control the utility.

The damages suffered by the public from the breach of the contract were not mitigated in any degree by the change in the control of utility, for, as before stated, the public was the sufferer from the breach of the contract, regardless of the particular agency which represented the public in the control of the utility. There was neither in fact nor in law a mitigation of damages, and I think that the city should be permitted to recover for all the damages which accrued from the breach.