## TOWN OF CORDOVA v. ALASKA PUBLIC UTILITIES.
No. C–690.

District Court of Alaska. Third Division. Valdez.
Aug. 12, 1937.

Walter H. Hodge, of Cordova, for plaintiff.

Thos. M. Donohoe, of Cordova, for defendant.

HELLENTHAL, District Judge.

According to the agreed statement of facts which it is unnecessary to repeat, three questions are submitted for the court's decision.

First: Is the oral contract made between the Town of Cordova and the Alaska Public Utilities, relating to a charge of five cents per kw hour for lighting the municipal building, enforceable, or is it ultra vires and void?

Second: May the defendant corporation lawfully charge a rate of five cents per kw hour to the Town of Cordova for lighting the municipal building?

Third: May the Town of Cordova lawfully fix the rate to be charged for such lighting service at five cents per kw hour?

The answers to these three questions depend upon the fact of whether or not the municipality may contract for or establish a rate under which the Alaska Public Utilities furnish the Town of Cordova electric current for a rate less than the said Alaska Public Utilities furnish like service to the inhabitants of the town.

In connection with which it is urged that since the franchise, in the instant case, was granted before the passage of the act, C.L.A.1933, §§ 2410–2412, granting the Town of Codorva the right to regulate rates, therefore the law does not apply to this franchise. This question, however, was decided in the case of the Alaska Electric Light and Power Company v. City of Juneau, Alaska, 9

Cir., 294 F. 864, 867, 5 Alaska Fed. 202, in which the courts say: "The provision was clearly intended to refer, not only to franchises thereafter to be granted, but to franchises then in existence."

The law governing the furnishing of public service is well stated in Pond on Public Utilities, p. 303, sec. 279 and 280:

"Uniform Service To All of Class and of Similar Classes. By way of defining the conditions which determine the class and fix the terms of service accordingly the case of State [of Missouri v. Bell Tel. Co., [C.C.], 23 F. 539, decided in 1885, is an early decision prohibiting a telephone company from limiting its service to one telegraph company or to any particular line of business. In holding that having established a telephone system, it must serve all classes of business including any telegraph company that applied for service in the same way and without discrimination, the court said: 'A telephonic system is simply a system for the transmission of intelligence and news. It is, perhaps, in a limited sense, and yet in a strict sense, a common carrier. It must be equal in its dealings with all. It may not say to the lawyers of St. Louis, "my license is to establish a telephonic system open to the doctors and the merchants, but shutting out you gentlemen of the bar." The moment it establishes a telephonic system here, it is bound to deal equally with all citizens in every department of business; and the moment it opened its telephonic system to one telegraph company that moment it put itself in a position where it was bound to open its system to any other telegraph company tendering equal pay for equal service.'

"The practical reason for refusing the public utility the right to discriminate among its customers of the same or similar classes, although it may treat different classes differently, is clearly shown in the recent case of Arkansas Natural Gas Co. v. Norton Co. [165 Ark. 172], 263 S.W. 775, where the court said: 'Now a corporation supplying natural gas to consumers cannot be considered as a public utility with respect to certain classes of its consumers and as

a private corporation with regard to certain others. The acceptance by the Arkansas Natural Gas Company of the franchise and privileges granted it carried with it the duty of supplying all persons and corporations along the lines of its main with natural gas without discrimination. All are entitled to have the same service on equal terms and at a uniform rate. The law will not tolerate a discrimination in the charges of public utility corporations. · * * * In this connection it may be stated that, while public service corporations cannot act arbitrarily, or discriminate among their consumers similarly situated by way of favoring one consumer or class of consumers over others, a distinction may be made between different consumers or classes of consumers on account of location, amount of consumption, or such other material conditions which distinguish them from each other or from other classes. Yancey v. Batesville Telephone Co., 81 Ark. 486, 99 S.W. 679, 11 Ann.Cas. ° 135; Southwestern Telegraph & Telephone Co. v. Sharp & White, 118 Ark. 541, 177 S.W. 25, L.R.A.1915E, 323; and Pond on Public Utilities, sec. 213, p. 262 * * * As we have already seen, under modern business conditions, public utilities are a necessity and have a practical monopoly in the fields occupied by them respectively in the business world. Their products must be accepted and used, not only for domestic convenience, but on account of business necessities.' * * * They also have a right to establish rates which are equivalent to the service performed by them. Thus they acquire a great advantage over their business rivals, and are thereby enabled to furnish gas to consumers at a much cheaper rate and under much more favorable conditions. The manufacturer needing and using gas in his business must purchase it from the public service corporation, or his business competitors, who have such service, will have a great advantage over him. If a manufacturer or other business enterprise cannot secure the service upon the same terms and under the same conditions as his rivals in business, he will suffer serious loss or damage

to his business; and in some cases his business will be entirely destroyed. If the public service corporation is allowed to act in an arbitrary and discriminatory manner in performing its service to the public it can in all cases seriously injure any of its customers or destroy his business entirely."

"Municipality—The rule prohibiting discrimination in service or rates applies to the municipality equally with privately owned public utilities as is shown in the case of City of Montgomery v. Greene, 187 Ala. 196, 65 So. 783: 'It is conceded that the former holding is sound if we were dealing with an ordinary water company undertaking to supply water for a profit instead of with a municipality which had undertaken to supply its inhabitants with water. This point was so strongly urged upon the former appeal and upon the application for rehearing that we attempted to respond to same, and we again refer to the authorities quoted and cited in said response, which puts a municipality upon the identical footing with an ordinary company when undertaking to supply a monopoly. Indeed we have found no authority which warrants the distinction contended for, and find many that do not. If, however, the authorities authorized a distinction, we think the question is settled by the statute under which the city derives its rights and powers, and which contemplates that the rights and powers of the city over the extension should be the same as that given and exercised over the original system.'

"This general principle prohibiting discrimination is perhaps best expressed by the United States Supreme Court in the case of [People of State of] New York v. McCall, 245 U.S. 345, 38 S.Ct. 122, 62 L.Ed. 337, as follows: 'Corporations which devote their property to a public use may not pick and choose, serving only the portions of the territory covered by their franchises which it is presently profitable for them to serve, and restricting the development of the remaining portions by leaving their inhabitants in discomfort without the service which they alone can render.

To correct this disposition to serve where it is profitable and to neglect where it is not is one of the important purposes for which these administrative commissions, with large powers, were called into existence, with an organization and with duties which peculiarly fit them for dealing with problems such as this case presents, and we agree with the Court of Appeals of New York [219 N.Y. 84, 113 N.E. 795, Ann.Cas.1916E, 1042] in concluding that the action of the commission complained of was not arbitrary or capricious, but was based on very substantial evidence, and therefore that, even if the courts differed with the commission as to the expediency or wisdom of the order, they are without authority to substitute for its judgment their views of what may be reasonable or wise.'

. "Discrimination is not permitted in order to avoid an additional charge on customers not so favored for as the court in the recent case of Monroe Water Co. v. Town of Monroe [130 Wash. 351], 227 P. 516, says: 'There is, however, a distinction between the facts of the cited cases and the facts presented here, in that the cited cases refer to provisions in the franchises relating to charges for services rendered to private persons, while here the franchise rates relate to services rendered to the municipality by whom the franchise was granted. But we cannot think this distinction should make a difference in the rule. It is the purpose of the statute to grant to a public service corporation a fair return and no more upon the property it employs in the public service it renders, and it is its further purpose to divide the cost of making up this return equably and ratably among the users of the service. It needs no argument, of course, to show that if indulgences and privileges are granted to one class of users, lessening the cost of the use to them, the difference must be made up by increasing the cost to other classes of users."

In the City of Charleston v. Public Service Commission, 86 W.Va. 536, 103 S.E. 673, 675, the court holds:

"That the free water provision is discriminatory becomes apparent upon first glance. The company is entitled to receive a fair return upon its investment, and, when that has been determined after proper investigation, rates must be so adjusted as to yield a net income equivalent to the return fixed. If the city receives its water free of charge, the burden of contributing to the sum named may rest solely or mainly upon the rate payer to the exclusion or partial exclusion of the taxpayer. The former pays not only for the water which he uses, but also for that which the city consumes, the benefit of which accrues to the citizens as a whole and for which they as taxpayers should pay. Service of this character is contrary to the policy of the Public Service Commission Act (Code, c. 15–o). Shrader v. Steubenville, etc., Traction Co., 84 W.Va. [1], 99 S.E. 207, and cases cited.

"A distinction is urged, however, between the power of a municipality, through a franchise, to fix rates for itself and its power to fix rates for its inhabitants, and the case of People ex rel. South Glen Falls v. Public Service Commission, 225 N.Y. 216, 121 N.E. 777, is cited therefor. This case in turn rests upon Kings County Lighting Co. v. City of New York, 221 N.Y. 500, 116 N.E. 1055, affirming without opinion 176 App.Div. 175, 162 N.Y.S. 581. * * * "

In Public Service Electric Company v. Board of Public Utility Commissioners of City of Plainfield, 87 N.J.L. 128, 93 A. 707, at page 708, the court holds: "The evil sought to be eradicated was the insidious influence which might be exercised on municipal bodies and offices against the general public welfare, by the donors of such gratuities. Therefore, where it appears, as it does in this case, that the gratuity granted by the predecessor of the prosecutor to the city of Plainfield to light all its public buildings, offices, and rooms free of charge forever, because it has received the privilege of placing and maintaining its poles and wires in the streets and subways of the city of Plainfield, no other

evidence is required or necessary than is furnished by the contract to demonstrate that the preference or advantage given by the contract is undue and unreasonable and within the inhibition of the Public Utilities Act. The fact that there was such undue and unreasonable preference or advantage given is sufficient basis to set aside the order made by the Public Utilities Commissioners."

President and Trustees, etc. v. Southern Wisconsin Power Co., 149 Wis. 168, 135 N.W. 499, at page 504, holds: "It could hardly·be claimed under these sections of the public utilities law that a utility could, by resorting to any device or subterfuge, make a valid agreement with a consumer to furnish the latter with free current to the amount of $3,500 per year; and the appellant does not so claim. Some of the main purposes of this law were to compel public service corporations to file their rates, so that they would be open to public inspection, to make reasonable rates of charge, and to make one consumer pay the same as another, where the service was furnished under substantially similar conditions. To accomplish these results, the language used is as broad and comprehensive as it could well be made. Individual cases may arise where the Legislature might possibly have made an exception, had the concrete case been in mind when the act was passed. But the courts cannot write these exceptions into the law. We must enforce it as we find it. The village of Kilbourn is one of the patrons of the defendant that is entitled to receive the same consideration in the matter or rates of charge that any other patron is entitled to receive—no less, no more. By taking advantage of a situation where it was able to force the defendant into making an unlawful contract, it can no more profit thereby than could any other purchaser of current from the defendant. It is in the same situation that any private riparian owner would be who thought he had an opportunity to drive a hard bargain."

City of Billings v. Public Service Commission et al., 67 Mont. 29, 214 P. 608, at page 610, holds: "Nor is there

any basis for the city's contention that it is entitled to preference where its inhabitants would not be. The city is a consumer, as are its inhabitants who patronize the Utility. When the city receives its heat free, the Utility's other patrons foot the bill. Discrimination of this sort is not to be tolerated, and the Commission was right in putting a stop to it."

 Considering the rules of law laid down in the foregoing texts and cases, the court is of the opinion that the Alaska Public Utilities cannot legally furnish like service to the City of Cordova for less than it charges the inhabitants of the town; that the questions propounded in the agreed statement of facts can be answered neither in the affirmative or the negative; that the oral contract made is valid and the defendant corporation may lawfully charge the rate of five cents per kw hour to the Town of Cordova and the Town of Cordova may lawfully fix the rate to be charged for lighting service at such a rate for current furnished said town for lighting the fire hall of said town; that said service is in a different class from current furnished the inhabitants of the town; that it is unlawful for the Town of Cordova to make a contract with the Alaska Public Utilities or fix a rate to be charged for electric current used in connection with the apartment and the hall sometimes used as a dance hall for a rate less than the rate charged the residents of the Town of Cordova for the same class of service; that the service furnished in connection with the apartment and hall is of the same class as that furnished the inhabitants of the town at a higher rate and therefore unlawful.

The attorneys for the plaintiff may prepare findings of fact, conclusions of law and a decree in accordance with the foregoing opinion.